**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Wynne Transportation LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| City of Chicago, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT, REQUEST FOR DECLARATORY JUDGMENT, AND REQUEST FOR INJUNCTIVE RELIEF**

NOW COMES Plaintiff Wynne Transportation LLC ("Plaintiff") and files this Complaint, Request for Declaratory Judgment, and Request for Injunctive Relief against Defendant City of Chicago ("City" or "Defendant") and alleges as follows.

**INTRODUCTION**

1. This case is about allowing immigrants the opportunity to call Chicago home.

2. The City of Chicago has a long history of welcoming immigrants from around the world: from its beginnings forged by the immigrant Jean Baptiste Point du Sable, to the influx of European immigrants in the 19th Century that dug the I & M Canal and established many of the City's diverse neighborhoods, to the Great Migration of the 20th Century.

3. Like the centuries before it, the 21st Century presents its own immigration dynamics. Rather than welcoming migrants and giving them sanctuary, Chicago is turning its back on those wishing to travel here by enacting an ordinance that targets the transportation companies that transport migrants from our southern border to their desired destination–Chicago–in violation of Plaintiff's constitutional rights.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action because the suit arises under the United States Constitution and federal statute.

5. This action is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201 to redress the deprivation under color of an ordinance of Plaintiff's constitutional rights.

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 as Plaintiff asserts claims under federal law, and its state law claims all arise out of the same facts as its federal claims.

7. Venue is appropriate in this Court under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

8. Plaintiff, Wynne Transportation LLC is a limited liability company that is organized under the laws of the State of Delaware.

9. Defendant City of Chicago is a municipal corporation of the State of Illinois and may be served by delivering a copy of the summons and of the Complaint to the mayor or city clerk.

## FACTS

10. In the summer of 2021 as part of what Governor Abbott declared Operation Lonestar, the State of Texas contacted Plaintiff and asked it to transport migrants to Chicago.

11. To meet the State of Texas' needs, Plaintiff provides transportation itself and also contracted with various companies that provide transportation services ("subcontractors").

12. Migrants voluntarily opted into the transportation program, funded by the State of Texas, to travel to various destinations, including Chicago.

***The City of Chicago attempts to block the transportation program.***

13. On May 15, 2023, the City of Chicago's Mayor, Brandon Johnson, issued Executive Order No. 2023-16, according to which the office of Deputy Mayor for Immigrant, Migrant, and Refugee Rights was established to provide recommendations to the Mayor.[1] Shortly after the Order, attempts to prevent migrants' entry to Chicago were seen. These attempts were sometimes seen with discriminatory remarks.

> One member of the Chicago City Council will propose changing the welcoming city ordinance amid the ongoing migrant crisis.
> WLS
>
> CHICAGO (WLS) -- One Chicago alderman wants to tweak the city's welcoming ordinance amid the ongoing migrant crisis.
>
> "We need to set some ground rules on what is acceptable in our city, what we are willing to accept of our new guests, new arrivals," 15th Ward Ald. Ray Lopez said.

https://abc7chicago.com/chicago-city-council-migrants-us-news/13723125/ (Last visited on December 29, 2023).

14. In September 2023, several members of the City Council introduced Resolution R2023-0004224 to submit the following question for a referendum:

> **"Should the City of Chicago continue to keep its designation as a Sanctuary City?"[2]**

15. In November 2023, allies of Mayor Brandon Johnson offered an alternative question for referendum:

> **"Should the City of Chicago impose reasonable limits on the City's providing resources for migrant sheltering, such as funding caps and shelter occupancy time limits, if necessary to prevent a substantial negative impact on Chicago's current residents?"[3]**

---

[1] *See* https://chicityclerk.s3.us-west-2.amazonaws.com/s3fs-public/Executive%20Order%202023-16%20(Immigrant%2C%20Migrant%2C%20and%20refugee%20Rights).pdf (Last visited on December 29, 2023).

[2] *See* https://occprodstoragev1.blob.core.usgovcloudapi.net/matterattachmentspublic/f86589f4-55c8-4530-95a8-6f36a14556e6.pdf (Last visited on December 29, 2023).

[3] *See* https://www.cbsnews.com/chicago/news/chicago-city-council-sanctuary-city-referendum-debate/ (last visited on December 29, 2023.

16. Suspicious about the outcome of having an open and honest discussion about migrant issues, the City of Chicago decided to achieve the same goal, preventing migrants' entry, through more byzantine means: amending traffic ordinances.

*Section 9-48-050 Prior to the 2023 Legislative Session*

17. Prior to the City of Chicago's 2023 Legislative Session, the Municipal Code of Chicago, Section 9-48-050, titled "Buses – Stopping, standing and parking" (as amended in 2023, hereinafter referred to as "the Ordinance"), provided that:

> (f) No owner or operator of any intercity bus shall use any designated bus stop, bus stand, or passenger loading/unloading zone for regular loading or unloading of passengers, luggage or other goods without first obtaining the approval of the commissioner. Application for such approval shall be made upon a form provided by the commissioner, and shall contain the name and address of the applicant, the location of the proposed bus stop, bus stand, or passenger loading/unloading zone where such regular loading or unloading of passengers, luggage or other goods shall take place, the length of time any such bus shall stand in the proposed bus stop, bus stand, or passenger loading/unloading zone, and the number of buses that shall leave from and come to the proposed bus stop, bus stand, or passenger loading/unloading zone per day. Such application shall be signed by the applicant.
>
> The commissioner shall approve or deny the application no later than 30 days after the application was filed. If the commissioner denies the application, it shall be based upon a determination that the regular loading/unloading of passengers, luggage or other goods in that particular designated bus stop, bus stand, or passenger loading/unloading zone presents an unreasonable threat to the health, safety and welfare of the public or impedes the safe and efficient flow of traffic. If the commissioner denies the application, he shall mail a notification to the applicant in writing specifying the reasons for his decision. Any applicant may seek review of the decision of the commissioner denying such application in the manner provided by law. The provisions of this subsection shall not apply to any bus used as "Charter/sightseeing vehicle" as that term is defined in Section 9-114-010 of this Code.

18. According to this version of the ordinance, an intercity bus is required to obtain the commissioner's approval only if it uses a designated loading/unloading area for "<u>regular</u> loading

4

or unloading of passengers, luggage or other goods." Therefore, no approval was needed for irregular or occasional use of a designated area.

19. Additionally, the limitation of subparagraph (f) of the pre-2023 ordinance did not apply to charter buses.

*Section 9-48-050 following the November 16th Amendment.*

20. On or about November 16, 2023, the City amended[4] Section 9-48-050(f) as follows[5]:

> (f) No owner or operator of any intercity bus shall use any designated bus stop, bus stand, or passenger loading/unloading zone or other location for regular loading or unloading of passengers, luggage or other goods without first obtaining the approval of the Commissioner.
>
> Application for such approval shall be made upon a form provided by the Commissioner, and shall contain the name and address of the applicant, the location of the proposed bus stop, bus stand, or passenger loading/unloading zone or other location where such regular loading or unloading of passengers, luggage or other goods shall take place, the time of day and length of time any such bus shall stand in the proposed bus stop, bus stand, or passenger loading/unloading zone or other location, and the number of buses that shall leave from and come to the proposed bus stop, bus stand, or passenger loading/unloading zone or other location per day. Such application shall be signed by the applicant.
>
> The Commissioner shall approve or deny the application no later than 30 days after the application was filed. The Commissioner's review of the application shall take place in consultation with the local alderperson, and shall take into consideration administrative efficiency and available resources, public safety, and orderly traffic flow, and a permit shall be subject to such conditions and restrictions that the Commissioner may impose in his sole discretion (including, without limitation, those addressing day/time availability of any such location(s), number of daily arrivals/departures to/from any such location(s), and advance notification

---

[4] No records have been found indicating the date and circumstances of the November 16 amendment. The date of the amendment was mentioned at the City Council Committee on Pedestrian and Traffic Safety's meeting on December 8, 2023. *See* https://vimeo.com/showcase/8928552 (last visited on December 28, 2023).

[5] It is not clear whether the November 16th Ordinance was ever published. No records of its proposal or signed version has been found. The aforementioned legislation text is based on what appeared on the December 8, 2023, proposed amendment.

requirements by the applicant). If the Commissioner denies the application, it shall be based upon a determination that the loading/unloading of passengers, luggage or other goods at that time, or in that particular designated bus stop, bus stand, or passenger loading/unloading zone or other location presents an unreasonable threat to the health, safety and welfare of the public or impedes the safe and efficient flow of traffic or imposes an unreasonable burden on available resources. If the Commissioner denies the application, the Commissioner shall send by e-mail or U.S. mail a notification to the applicant in writing specifying the reasons for the decision. Any applicant may seek review of the decision of the Commissioner denying such application in the manner provided by law. The loading or unloading of an intercity bus in violation of this subsection (f) shall subject the violator to a fine of no less than $2,000 and no more than $10,000. Each instance of unauthorized loading or unloading shall constitute a separate violation. The provisions of this subsection shall not apply to any bus used in conducting a "sightseeing tour" as that term is defined in Section 9-114-010 of this Code.

21. The material changes of the November 16th amendment included: (a) addition of the phrase "or other location" which broadened the scope of the Ordinance to cover locations that are not considered designated loading or unloading areas; (b) allowing the commissioner to place any conditions or restrictions on the permit based on his sole discretion; (c) adding a fine to compel compliance with the Ordinance; and (d) removing the charter bus exception.

22. It is important to note that this version of the Ordinance only applied where a location was being used for "regular loading and unloading."

23. Additionally, on November 16, 2023, the Commissioner of Transportation issued an order promulgating several rules applicable to Section 9-48-050. The Commissioner classified the intercity buses into two categories of regularly scheduled and unscheduled intercity buses. The regularly scheduled bus was defined as an intercity bus "that operates trips on a predictable and recurring basis, following a schedule that is <u>published in advance</u> and <u>available to the general</u>

6

public, and provides service <u>in exchange for paying a fare</u>." *See* Rule 1 (*emphasis added*).[6] The Commissioner then placed stringent limits on the unscheduled intercity buses by: (1) requiring submission of the application at least 2 full business days prior to the requested date of arrival (Rule 3)[7]; (2) limiting the total number of permits throughout the entire City to two per day (Rule 4); (3) limiting the days and hours of operation to Monday to Friday between 8:00 am and 5:30 pm (Rule 5); (4) designating only one pickup/drop off location (Rule 6); (5) requiring the bus to arrive within 30 minutes before or after the approved arrival time (Rule 7); (6) requiring a copy of the approved application at the loading/unloading place (Rule 8); (7) requiring specification of the arrival time on the application.

24. Relying on these changes, the City of Chicago initiated over 35 legal actions against various Plaintiff's subcontractors for alleged violation of the amended ordinance.

*Section 9-48-050 following the December 13th Amendment.*

25. On December 8, 2023, another amendment to Section 9-48-050 was introduced, which included the following changes:

a. The title was changed to "Buses – Loading and unloading."

b. The scope of paragraph (f) was broadened again to cover any locations regardless of its regular or irregular use.

> (f) No owner or operator of any intercity bus shall use any designated bus stop, bus stand, or passenger loading/unloading zone, or any other location, for regular loading or unloading of passengers, luggage or other goods without first obtaining the approval of the Commissioner.

c. Adding an administrative penalty of $3,000.

---

[6] *See* https://www.chicago.gov/content/dam/city/depts/cdot/IntercityBus/CDOT%20Bus%20Rules%209-48-050-signed.pdf (Last visited on January 2, 2024).

[7] **It is important to note that pursuant to Section 9-48-050, the commissioner has 30 days to review the request. Therefore, compliance with the Section 9-48-050 and the Rules essentially requires submission of the request 32 days prior to the date of arrival.**

7

> (h) Any motor vehicle used in violation of subsection (f) of this section shall be subject to seizure and impoundment pursuant to this section. In addition to any other applicable penalty, the owner of record of such motor vehicle shall be subject to an administrative penalty of $3,000 plus any towing and storage fees applicable under Section 9-92-080.

    d. Making any violation subject to seizure and impoundment.

> (i) Whenever a police officer who is present at the time of an alleged violation of subsection (f) has probable cause to believe that a vehicle is subject to seizure and impoundment pursuant to this section, the police officer shall provide for the towing of the vehicle to a facility controlled by the City or its agents. Before or at the time the vehicle is towed, the police officer shall notify any person identifying themselves as the owner of the vehicle at the time of the alleged violation or the person who is found to be in control of the vehicle at the time of the alleged violation, if there is such person, of the fact of the seizure and of the vehicle owner's right to request a vehicle impoundment hearing to be conducted under Section 2-14-132 of this Code by serving such person with a copy of the vehicle impoundment seizure report.

26. The amendment was passed by Chicago's City Council on December 13, 2023, with 49 yes votes and one abstention.[8] The abstention was from Ward 33 Alderman, Rossana Rodriguez Sanchez, a member of the Latino Caucus.

27. On the same date, the first bus operated by one of Plaintiff's subcontractors was impounded. Since then, Chicago has continued impounding more buses.

***Other cities in Illinois are enacting similar ordinances.***

28. Following Chicago, other cities and towns started to join the campaign to stop the migrants and asylum seekers from entering their jurisdictions.



https://www.dailyherald.com/20231228/news/elburn-passes-village-ordinance-to-address-migrants-arriving-on-buses/ (Last visited on December 29, 2023).

---

[8] *See* https://chicago.councilmatic.org/legislation/o2023-0006210/ (last visited on December 28, 2023).



https://www.daily-journal.com/news/local/city-takes-steps-regarding-migrants-mayor-issues-executive-order/article_992823cc-a333-11ee-bc1d-dbf873cde48d.html (Last visited on December 29, 2023)



https://www.nbcchicago.com/news/local/suburbs-quickly-work-to-pass-ordinances-combating-unannounced-drop-offs-from-migrant-buses/3313254/ (Last visited on December 29, 2023).

## COUNT I – DECLARATORY JUDGMENT
### (Violation of the Supremacy Clause of the U.S. Constitution)

29. The preceding paragraphs 1-28 are incorporated herein by reference.

30. The Supremacy Clause enables Congress to preempt state law. A state law is preempted if Congress: (1) enacts a statute with an express preemption provision; (2) determines that a field must be controlled by its exclusive governance; or (3) when the state law conflicts with federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id*.

9

(*internal citation omitted*). The federal government has "broad, undoubted power" over immigration. *Id.* at 394. "The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* 395. "Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders." *Id.* at 401-02.

31. In *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013), an ordinance that required occupancy licenses before renting was deemed to infringe on Congress's authority over the subject of immigration. The ordinance was seen as forcing undocumented aliens to relocate, which was considered as establishing the city's own regulations on immigration. The court held that the criminal offense and penalty provisions of the city ordinance and its state judicial review process was preempted by federal immigration laws. *See also State v. Sarrabea*, 157 So. 3d 1 (La. App. 3 Cir. 2013) (holding that the statute prohibiting driving without documentation of lawful presence in United States was preempted).

32. Similarly, the Ordinance is specifically designed to prevent entry of migrants into Chicago by placing stringent requirements and harsh punishments. Therefore, the City of Chicago is creating its own policy and regulations concerning immigration, and hence, violating the Supremacy Clause.

33. Plaintiff seeks a declaration by this Cour that the Ordinance violates the Supremacy Clause of the U.S. Constitution and is therefore void *ab initio*.

34. An actual controversy exists concerning the Ordinance and the declaration requested herein will terminate the controversy.

**COUNT II – DECLARATORY JUDGMENT**
**(Violation of the Interstate Commerce Clause of the U.S. Constitution)**

35. The preceding paragraphs 1-28 are incorporated herein by reference.

36. The Ordinance interferes with trips from points outside of Illinois, and hence, it is controlled by the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. Section 9-48-050 (e) defines "intercity bus" as "any bus used for transportation of persons between the City of Chicago and locations outside of the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area.[9]

37. Local ordinances that discriminate against interstate commerce, whether facially or in effect, are invalid. *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). The court should apply the "strictest scrutiny" to analyzing a discriminatory law. *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).

38. The Ordinance discriminates against interstate commerce both on its face and in effect.

39. A statute or ordinance that facially applies even-handedly to in-state and out-of-state market participants may violate the Commerce Clause if it burdens interstate commerce by impacting the out-of-state participants more than their in-state counterparts. In *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), allegedly to prevent fraud in the marketing of apples, a North Carolina statute required all apples shipped in closed containers in North Carolina, to have either a USDA label or no label. The Supreme Court held that the statute violated the Commerce Clause because its practical effect was to burden interstate commerce by prohibiting the display of superior Washington State grades on apples.

---

[9] See https://occprodstoragev1.blob.core.usgovcloudapi.net/matterattachmentspublic/e844267c-3409-456a-8fd3-5153fe1bde47.pdf (Last visited on January 2, 2024).

40. Similarly, the Ordinance targets the out-of-state unscheduled intercity buses. The stringent limits placed on these buses, coupled with harsh punishment for violation of the Ordinance, are designed to force Plaintiff to use subcontractors within the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area, instead of Texas transportation companies.

41. Additionally, a state law that has an extraterritorial effect violates the Commerce Clause. Therefore, under the Commerce Clause, a state law cannot have the practical effect of controlling conduct beyond the boundaries of the state. *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989) (striking down a Connecticut statute requiring the out of state shippers of beer to affirm that their posted prices are not higher than the prices in bordering states). "[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.*

42. The Ordinance punishes the transportation companies working with the State of Texas. Additionally, the Ordinance's unreasonable permit procedures and its strict arrival time requirements dictate how the transportation companies should arrange their departure date and time in Texas and effectively prohibit cross-country travel. Furthermore, following the Ordinance, other cities in Illinois, New York, and Denver adopted the Chicago model to prevent the transportation companies from providing services to the State of Texas.[10]

43. Finally, a regulation cannot impose conditions hampering a right to pursue interstate commerce operations. *Park 'N Fly of Tex., Inc. v. City of Houston*, 327 F. Supp. 910

---

[10] *See* https://www.cnn.com/2023/12/30/us/asylum-seekers-texas-city-mayors/index.html (Last visited on January 2, 2024).

(S.D. Tex. 1971). In *Park 'N Fly of Tex.*, the Court held that the classification of shuttle buses from a parking lot company as commercial vehicles and prohibiting their loading and unloading at particular areas at the Houston airport, but allowing use by the same type vehicles owned by the City of Houston was a burden and obstruction to interstate commerce. *Id.* at 922-24. The Court reasoned that while purporting to be a traffic and safety regulation, the subject ordinance "was drawn to cast [the private parking company] in the role of supplying inferior parking service to airport passengers in order that the city's competitive advantage might be enhanced." *Id.* at 923-24.

44. Similarly, the Ordinance is hampering Plaintiff's right to pursue interstate commerce operations by *inter alia*: (1) creating strict permit procedures, which may result in 32 days delay of a trip; (2) prohibiting operation after business hours; (3) prohibiting operation during weekends; and (4) subjecting Plaintiff to significant fines and seizure of its buses for each violation of the Ordinance.

45. Plaintiff seeks a declaration that the Ordinance violates the Commerce Clause of the U.S. Constitution and is therefore void *ab initio*.

46. An actual controversy exists concerning the Ordinance and the declaration requested herein will terminate the controversy.

### COUNT III–DECLARATORY JUDGMENT
### (Violation of the Equal Protection Clause of the U.S. Constitution)

47. The preceding paragraphs 1-28 are incorporated herein by reference.

**A.   Violation of the Equal Protection rights based on the national origin, alienage, and race of Plaintiff's passengers.**

48. The Ordinance is intentionally discriminatory based on national origin, alienage, and race and fails the "strict scrutiny" test. Although it may be facially neutral, it has an adverse

effect motivated by discriminatory animus and also was applied in an intentionally discriminatory manner. *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000).

49. The intentional discrimination is obvious from: (1) the City Council members' proposed referendums on migrant issues; (2) the purported traffic rules that target only the migrant charter buses; and (3) comments from some city council members such as "[w]e need to set some ground rules on what is acceptable in our city, what we are willing to accept of our new guests, new arrivals." *See e.g.*, *Deide v. Day*, 2023 WL 3842694, *16 (S.D.N.Y, June 6, 2023) (holding that the following comments strongly suggest the discriminatory motive of the decision makers: "these people" and "are they going to be walking around your kid's elementary school").

50. The Ordinance unlawfully discriminates based on alienage, national origin, and/or race on its face and/or as applied and therefore violates the Equal Protection Clause.

**B.     Violation of Plaintiff's Equal Protection rights due to arbitrary classification.**

51. The Ordinance treats similarly situated persons (bus companies and their passengers) differently.

52. In *Park 'N Fly of Tex., Inc. v. City of Houston*, 327 F. Supp. 910, 925-26 (S.D. Tex. 1971), the court held that the classification of shuttle busses from a parking lot company as commercial vehicles and prohibiting their access to upper level passenger discharge areas at Houston airport, but permitting access to the same type vehicles owned by the city of Houston was arbitrary and unreasonable and in violation of the Equal Protection Clause.

53. The rules implementing the Ordinance classified the intercity buses into two categories of regularly scheduled and unscheduled intercity buses. The rules then placed stringent limits on the unscheduled intercity buses. The distinction between these two categories of buses is completely arbitrary and unreasonable. For instance, regularly scheduled intercity curbside buses

can drop off passengers anytime and for an unlimited number of trips. However, an unscheduled intercity bus can only have two drop offs in Chicago per day, Monday to Friday between 8:00 am and 5:30 pm, and must arrive within 30 minutes before or after the approved arrival time, and must obtain pre-approval from the Commission before dropping off any passengers, anywhere.

54. The Ordinance on its face and/or as applied treats similarly situated persons differently without a reasonable basis, in violation of the Equal Protection Clause of the U.S. Constitution.

55. Plaintiff seeks a declaration that the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution of the U.S. Constitution and is therefore void *ab initio*.

56. An actual controversy exists concerning the Ordinance and the declaration requested herein will terminate the controversy.

### COUNT IV–DECLARATORY JUDGMENT
### (Violation of the Due Process Clause of the U.S. Constitution)

57. The preceding paragraphs 1-28 are incorporated herein by reference.

58. The Ordinance violates both Plaintiff's and its passengers' fundamental right of free movement/interstate travel and fails the strict scrutiny test. *See Williams v. Town of Greenburgh,* 535 F.3d 71, 75 (2d Cir. 2008)*; Jeffery v. City of New York,* No. 20-CV-2843, 2022 WL 204233, at *5 (E.D.N.Y. Jan. 24, 2022) ("Freedom of movement … is a well-established fundamental right"); *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (holding "that the Constitution protects a right to travel locally through public spaces and roadways."); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) ("Citizens have a fundamental right of free movement ...." (citation omitted)); *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990) ("[T]he right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the

concept of ordered liberty' and 'deeply rooted in the Nation's history'"); *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 776 (10th Cir. 2010) (acknowledging that the fundamental right of free movement protects the interstate travel).

59. "To trigger strict scrutiny, there need not be a complete bar to travel, as the right to intrastate travel includes freedom from curtailment of said travel." *Deide v. Day*, 2023 WL 3842694, *21 (S.D.N.Y, June 6, 2023).

60. The Ordinance violates the fundamental right of interstate travel of Plaintiff and its passengers. The Ordinance makes it extremely difficult, if not impossible, for Plaintiff to transport people across state lines from Texas to Chicago and even within Illinois.

61. The Ordinance is not narrowly tailored to serve a compelling state interest and therefore violates Plaintiff's Constitutional rights.

62. Plaintiff seeks a declaration that the Ordinance violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and is therefore void *ab initio*.

63. An actual controversy exists concerning the Ordinance and the declaration requested herein will terminate the controversy.

### COUNT VI – DECLARATORY JUDGMENT
**(Violation of the Special Legislation Clause of the Illinois Constitution)**

64. The preceding paragraphs 1-28 are incorporated herein by reference.

65. The Ordinance violates the Illinois Constitution's provision prohibiting special legislation. *See* IL Const., art IV, sec. 13 ("The General Assembly shall pass no special or local law when a general law is or can be made applicable.")

66. An ordinance adopted by the governing body of a city must satisfy the same requirement of reasonableness that is applicable to statutes enacted by the General Assembly.

67. By classifying the intercity buses into two categories of regularly scheduled and unscheduled intercity buses, and then placing stringent limits on the unscheduled intercity buses, the Ordinance confers upon the scheduled buses a special benefit that is denied to the similarly situated unscheduled buses—by allowing the scheduled buses to operate absent the Ordinance's burdensome restrictions. This violates the State's constitutional prohibition on special legislation. *Moline School Dist. No. 40 Board of Educ. v. Quinn*, 54 N.E. 3d 825, 831 (Ill. 2016).

68. The Ordinance infringes on the fundamental right of travel, discriminates in favor of a select group and makes an arbitrary classification between regularly scheduled and unscheduled intercity buses. This violates the Illinois Constitution's mandate that a general law should be made applicable to both groups.

69. The Ordinance on its face and/or as applied confers a special benefit or exclusive privilege on intercity buses with regularly scheduled service, buses operating within the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area, buses of the Chicago Transit Authority or other component of the Regional Transportation Authority, intercity buses that are used to transfer passengers to trains, and those buses approved by the Commissioner pursuant to the rules set forth above to the exclusion of Plaintiff.

70. The classifications imposed by the Ordinance, on its face or as applied, are unreasonable and therefore violate the Illinois Constitution's prohibition of special legislation.

71. Plaintiff seeks a declaration that the Ordinance violates the Illinois Constitution and is therefore void *ab initio*.

72. An actual controversy exists concerning the Ordinance and the declaration requested herein will terminate the controversy.

## COUNT VI – 42 U.S.C. § 1983

73. The preceding paragraphs 1-63 are incorporated herein by reference.

74. As allege above, Plaintiff has suffered a deprivation of its rights under the U.S. Constitution as a result of Defendant's Ordinance.

75. In passing and enforcing the Ordinance, Defendant was at all times acting under color of state law.

76. As a direct and proximate result of Defendant's action, Plaintiff has suffered damages including, but not limited to, lost economic opportunities and increased costs, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

A)   A declaration by this Court that the Ordinance violates the Supremacy Clause of the U.S. Constitution and is therefore void;

B)   A declaration by this Court that the Ordinance violates the Interstate Commerce Clause of the U.S. Constitution and is therefore void;

C)   A declaration by this Court that the Ordinance violations the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and is therefore void;

D)   A declaration by this Court that the Ordinance violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and is therefore void;

E)   A declaration by this Court that the Ordinance violates the Illinois Constitution's prohibition of special legislation and is therefore void;

F) Preliminary injunctive relief enjoining enforcement of the Ordinance during the pendency of this action;

G) Permanent injunctive relief enjoining enforcement of the Ordnance;

H) Compensatory damages in such amount as demonstrated by the proofs;

I) Attorney's fees and costs, as permitted by law; and

J) All other appropriate relief.

Respectfully submitted,

 /s/ Michael Kozlowski 

Christopher J. Esbrook (ARDC No. 6282829)
Michael Kozlowski (ARDC No. 6320950)
Marie Plecha (ARDC No. 6339526)
Esbrook P.C.
321 N. Clark Street, Suite 1930
Chicago, Illinois 60654
T: (312) 319-7680
christopher.esbrook@esbrook.com
michael.kozlowski@esbrook.com
marie.plecha@esbrook.com

and

Mark J. Levine (*pro hac vice forthcoming*)
Texas State Bar No. 00791102
Hamed Moradi (*pro hac vice forthcoming*)
Texas State Bar No. 24121020
WEYCER, KAPLAN, PULASKI & ZUBER, PC
24 Greenway Plaza, Suite 2050
Houston, Texas 77046
T: (713) 961-9045
F: (713) 961-5341
mlevine@wkpz.com
hmoradi@wkpz.com

*ATTORNEYS FOR PLAINTIFF*