**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

WYNNE TRANSPORTATION LLC,

                         Plaintiff,

          v.

CITY OF CHICAGO,

                        Defendant.

Case No. 24-cv-171

Hon. John J. Tharp

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE**
**<u>COMPLAINT PURSUANT TO RULES 12(b)(1) AND 12(b)(6)</u>**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 2

STANDARD OF REVIEW ..................................................................................................... 4

ARGUMENT ......................................................................................................................... 5

I.    Plaintiff Lacks Standing To Assert Claims On Behalf Of Bus Passengers. ....................... 5

II.   Plaintiff's Claims Should Be Dismissed For Failure To State A Claim. ............................ 6

   A.   Plaintiff's claim under the Supremacy Clause should be dismissed (Count I). ............... 6

   B.   Plaintiff fails to state a Dormant Commerce Clause claim (Count II). .......................... 10

   C.   Plaintiff fails to state an equal protection claim (Count III). ....................................... 14

      1.   Plaintiff fails to state a claim based on the different treatment of unscheduled and scheduled intercity buses. .................................................................................. 14

         a.   The two bus types are not similarly situated. ..................................................... 15

         b.   Treating the two bus types differently is rational. .............................................. 16

      2.   Plaintiff fails to state an equal protection claim based on its passengers. .................. 19

   D.   Plaintiff fails to state a right to travel claim (Count IV). ............................................ 20

      1.   Plaintiff does not have a fundamental right to travel. ............................................. 21

      2.   The City's regulations do not violate the right to travel. ......................................... 21

   E.   The special legislation claim should be dismissed (Count V). ..................................... 23

   F.   Count VI should be dismissed. ................................................................................. 25

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*A.J. California Mini Bus, Inc. v. Airport Comm'n of the City & Cnty. of San Francisco*, 148 F. Supp. 3d 904 (N.D. Cal. 2015) ……………………………………………......………… 18

*Albright v. Oliver*, 510 U.S. 266 (1994) ……………….…………….………………….………… 25

*AnchorBank, FSB v. Hofer*, 649 F.3d 610 (7th Cir. 2011) …………….……………………… 5

*Arizona v. United States*, 567 U.S. 387 (2012) ……………………………………...…. 7, 8, 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ………………………………………………….. 4, 5, 20

*Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898 (1986) …………………………… 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ……………………….………… 4, 9, 13

*BFC Enterps., LLC v. City of Murray, Ky.*, 2018 WL 1457223 (W.D. Ky. Mar. 22, 2018) …….. 15

*Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72 (D. Mass. 2015) …….………. 16

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) …………………...…………… 10

*Cahn v. City of Highland Park*, 2012 WL 917855 (N.D. Ill. Mar. 14, 2012) …………………… 15

*Caulkins v. Pritzker*, 2023 IL 129453 ……………………………………….…………… 23, 24

*Checker Cab Phila. v. Phila. Parking Auth.*, 306 F. Supp. 3d 710 (E.D. Pa. 2018) ……………..16

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) ………………………….…………… 15, 16

*Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597 (7th Cir. 2016) …………………… 18

*Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991) …………………………………………… 22

*Crandall v. State of Nevada*, 73 U.S. 35 (1867) ………………...…………………………… 21

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ………………………………... 7

*Cutinello v. Whitley*, 161 Ill. 2d 409 (Ill. 1994) ……………………………………………… 23

*Dahlstrom v. Sun-Times Media, LLC*, 346 F. Supp. 3d 1162 (N.D. Ill. 2018) …………….…... 17

*DeCanas v. Bica*, 424 U.S. 351 (1976) ……………………………………………………... 8

*Elementary Sch. Dist. 159 v. Schiller*, 849 N.E.2d 349 (2006) ………………..…………... 23

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) …………………………… 13

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ………………………..…………… 16, 17

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) …………………………………... 7

*Greer v. Amesqua*, 212 F.3d 358 (7th Cir. 2000) …………………………………………... 15

*Hillsborough Cty. v. Auto. Med. Labs., Inc.*, 471 U.S. 707 (1985) …………………………… 7, 8, 9

*Hope v. Comm'r of Indiana Dep't of Corrections*, 9 F.4th 513 (7th Cir. 2021) ………………… 20

*Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594 (7th Cir. 2016) ……………………… 16

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) ……………………………………… 9

*Kaczka v. Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 923 N.E.2d 1282 (Ill. App. 1st 2010) …………..…………………………………………… 24

*Kent v. Dulles*, 357 U.S. 116 (1958) …………………………………………………………… 21

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) …………………………………………………... 5

*LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937 (7th Cir. 2010) ……………………… 15

*Matthew v. Honish*, 233 F. App'x 563 (7th Cir. 2007) …………...………………………... 22

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999) …………………..………………………… 22

*Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047 (7th Cir. 2018) ……………………………... 12

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) …….…………………….... 11, 12, 13

*Owner Operator Indep. Drivers Ass'n, Inc. v. Pennsylvania Tpk. Comm'n*, 383 F. Supp. 3d 353 (M.D. Pa. 2019) ……………………………………………………………………… 13

*Owner Operator Indep. Drivers Ass'n, Inc. v. Pennsylvania Tpk. Comm'n*, 934 F.3d 283 (3d Cir. 2019) ………………………………………………………………………...……… 22

*Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495 (7th Cir. 2017) ……………… 10, 11, 12, 13

*Pierce v. Zoetis, Inc.*, 818 F.3d 274 (7th Cir. 2016) …………………………………………... 5

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) …………………………………………… 12

*Pollack v. Duff*, 793 F.3d 34 (D.C. Cir. 2015) ………………………………………………… 22

*Powers v. Ohio*, 499 U.S. 400 (1991) ………………………………………………………… 5, 6

*Quinones v. New York City*, 2022 WL 4787402 (S.D.N.Y. Oct. 3, 2022) ……………………… 20

*Richards v. Lavelle*, 620 F.2d 144 (7th Cir. 1980) ………………………………………….... 18

*Rosenblatt v. City of Santa Monica*, 940 F.3d 439 (9th Cir. 2019) ……………………………… 14

*RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476 (7th Cir. 2012) ………………………... 23

*Saiger v. City of Chicago*, 37 F. Supp. 3d 979 (N.D. Ill. 2014) ………………………………… 15

*Saenz v. Roe*, 526 U.S. 489 (1999) ……………………………………………………………… 20

*Singleton v. Wulff*, 428 U.S. 106 (1976) …………………………………….………… 6

*Smith v. City of Chicago*, 457 F.3d 643 (7th Cir. 2006) ……………………………………… 15

*Smith v. Turner*, 48 U.S. 283 (1849) ………………………………………………………… 21

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ………………………………………………... 4

*State v. Sarrabea*, 157 So. 3d 1 (La. App. 3 Cir. 2013) …………………………………….. 8

*Town of Southold v. Town of E. Hampton*, 477 F.3d 38 (2d Cir. 2007) ………………………… 22

*Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750 (7th Cir. 2002) …………………… 5

*United States v. Guest*, 383 U.S. 745 (1966) ………………………………………………… 21

*United States v. Leonides-Seguria*, 627 F. Supp. 3d 938 (N.D. Ill. 2022) ……………………… 19

*United States v. Machic-Xiap*, 552 F. Supp. 3d 1055 (D. Or. 2021) …………………………… 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) …………………… 19

*Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) ……….. 7, 8

*VIZIO, Inc. v. Klee*, 886 F.3d 249 (2d Cir. 2018) ……………………………………………... 13

*Warth v. Seldin*, 422 U.S. 490 (1975) ………………………………………………………... 5

**Ordinances**

MCC § 9-48-050  ………………………………………………….……………………… *passim*

**Administrative Materials**

Off. of Mgmt. & Budget, OMB Bulletin 09-01, *Update of Statistical Area Definitions and Guidance on Their Uses* (Nov. 20, 2008) …………………………………………… 3

## EXHIBIT LIST

**Exhibit A**: MCC § 9-48-050 (as amended December 13, 2023)

**Exhibit B**: Chicago Department of Transportation Rules (issued November 16, 2023)

## INTRODUCTION

The City has modest regulations governing buses that travel to Chicago from outside the Chicago area, whether coming from elsewhere in Illinois or out of state. These buses are defined as "intercity" buses. They can run on a regular, published schedule (like a Greyhound bus), or arrive on an ad hoc, unscheduled basis. Either way, the City requires bus operators to contact the City in advance with their proposed regular schedule (in the case of a scheduled intercity bus), or their proposed one-off arrival date and time (in the case of an unscheduled intercity bus), and obtain approval from the Commissioner of the City's Department of Transportation ("CDOT"). An application is approved unless the Commissioner concludes that the arrival time and location would pose threats to the passengers or public, impede traffic, or unreasonably burden the City's resources. This system serves an important planning function— it allows the City to manage its crowded streets and ensure that large buses of passengers from other cities, who are likely to be unfamiliar with Chicago, unload safely and at places and times where the passengers will have access to guidance, accommodations, or other resources.

Plaintiff is a Delaware company hired by the State of Texas to bus migrants out of that state, either on its own buses or through subcontractors. It challenges the City's intercity bus regulations as violating various constitutional provisions. It apparently wants to be able to drop off scores of migrants on the streets of Chicago without heed to the basic safety and traffic management concerns that underlie the City's regulations.

There is nothing to Plaintiff's claims, and the Complaint should be dismissed. At the outset, two of Plaintiff's claims allege that the City's regulations violate the rights of migrant bus passengers, but Plaintiff lacks standing to bring those claims. Bus passengers are third parties with whom Plaintiff lacks the necessary close relationship to be able to assert claims on their

1

behalf. Indeed, the Complaint shows that the only close relationship Plaintiff has is with the State of Texas, not migrants, for it is Texas that pays Plaintiff to orchestrate the trips to Chicago.

In addition, Plaintiff's claims all fail as a matter of law. The City's bus regulations do not violate the Supremacy Clause because they do not intrude into federal supremacy over immigration. Plaintiff's unilateral choice to pursue a line of business that happens to involve migrants does not transform the City's local and neutral regulations into preempted immigration enforcement. Nor do the City's regulations run afoul of the Dormant Commerce Clause, for they do not discriminate against out-of-state commerce on their face or in their effect—again, they apply equally to buses from Illinois or elsewhere. The regulations, moreover, do not create impermissible distinctions that violate equal protection or the Illinois Special Legislation Clause. Rather, they treat different classes of bus service in a tailored way well within the broad regulatory latitude afforded the City. And, finally, the City's regulations do not violate a fundamental right to travel under the Due Process Clause, for they regulate only one mode of transportation—intercity buses—and, even then, impose minimal requirements. For all these reasons, the Complaint should be dismissed.

## BACKGROUND

According to the Complaint, Plaintiff is a Delaware corporation that is paid by the State of Texas to "transport migrants to Chicago." Compl. ¶¶ 8, 10, 12. Plaintiff provides transportation itself and also subcontracts with other transportation companies. *Id.* ¶ 11.

Section 9-48-050 of the Municipal Code of Chicago ("MCC") regulates the conditions under which buses may load and unload passengers in the City. It states that (subject to exceptions) a bus may unload passengers only "at a designated bus stop, bus stand, passenger loading zone, or bus terminal." MCC § 9-48-050(a) (the current ordinance is attached hereto as Ex. A). It also more specifically addresses "intercity" buses, defined as those "used for

2

transportation of persons between the City of Chicago and locations outside of the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area (M.S.A.) (as defined by the Director of the United States Office of Management and Budget)." *Id*. § 9-48-050(e). This Metropolitan Statistical Area encompasses a tri-state area surrounding Chicago, including portions of southeastern Wisconsin and northwestern Indiana. *See* Off. of Mgmt. & Budget, OMB Bulletin 09-01, *Update of Statistical Area Definitions and Guidance on Their Uses* (Nov. 20, 2008), Appendix at 28 (defining the M.S.A. to include several Illinois counties near Chicago, as well as Kenosha County in Wisconsin and Lake, Porter, Newton, and Jasper Counties in Indiana).[1] The M.S.A. therefore does not include most of Illinois, including many populous cities like Rockford, Springfield, and Champaign-Urbana. *Id.* Accordingly, a bus traveling to Chicago that originates in one of these Illinois cities (or anywhere else in Illinois that is outside the M.S.A.) is regulated as an intercity bus just as is a bus coming from Texas.

Under the ordinance, any intercity bus is required to apply for and obtain the approval of the CDOT Commissioner before unloading passengers. MCC § 9-48-050(f). Among other information, an application is to include the proposed time of day and location where the bus will unload. *Id.* The Commissioner has up to thirty days to approve the application, and in reviewing it, the Commissioner is to consider "administrative efficiency and available resources, public safety, and orderly traffic flow." *Id.* An application may be denied if the Commissioner determines that unloading passengers at the proposed time and location "presents an unreasonable threat to the health, safety and welfare of the public or impedes the safe and efficient flow of traffic or imposes an unreasonable burden on available resources." *Id.*

---

[1] This bulletin is available online at: https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/bulletins/2009/09-01.pdf.

The CDOT Commissioner has promulgated rules implementing the ordinance. Ex. B hereto. Among other things, the rules address "unscheduled" intercity buses—those that are not operating pursuant to "(i) an approved letter of permission or (ii) an approved schedule and/or approved pick-up/drop-off zone, as of the effective date of these Rules." *Id.* Rule 1. Under the rules, the unloading of passengers from unscheduled intercity buses may occur between 8 a.m. and 5:30 p.m. on business days at location(s) designated by the CDOT Commissioner. *Id.* Rules 5–6. At least two full business days before arrival, unscheduled intercity buses must submit applications for their proposed date and time. *Id.* Rule 3. Up to two applications may be approved for a given arrival date, time, and location. *Id.* Rule 4. Drop-offs are limited to two per hour, regardless of operator. *Id.* The Complaint does not allege that Plaintiff or its subcontractors have ever attempted to comply with these application procedures.

The Complaint contains six counts: violation of the Supremacy Clause (Count I); violation of the Dormant Commerce Clause (Count II); violation of the Equal Protection Clause (Count III); violation of the right to travel under the Due Process Clause (Count IV); violation of the Illinois Constitution's Special Legislation Clause (Count V); and a request for damages under 42 U.S.C. § 1983 (Count VI).

## STANDARD OF REVIEW

With respect to Federal Rule of Civil Procedure 12(b)(1), "at the pleading stage, the plaintiff must clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation and quotation marks omitted). Likewise, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the court accepts as true all well-pleaded allegations, construing them in the

light most favorable to the plaintiff. *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). Conclusory allegations, however, are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678. And a plaintiff may plead itself out of court if the pleadings allege facts that demonstrate the plaintiff cannot state a claim. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753–54 (7th Cir. 2002).

## ARGUMENT

## I.     Plaintiff Lacks Standing To Assert Claims On Behalf Of Bus Passengers.

At various times in the Complaint, Plaintiff invokes alleged harm to migrant passengers as a basis for its claims. The first part of Count III alleges a violation of equal protection "based on the national origin, alienage, and race of Plaintiff's passengers," which Plaintiff believes subjects the ordinance to strict scrutiny review. Compl., Count III, heading A. And in Count IV, Plaintiff contends that the ordinance violates "both Plaintiff's and its passengers' fundamental right of free movement/interstate travel and fails the strict scrutiny test." *Id*. ¶ 58.

Plaintiff lacks standing to bring these claims. They are based on alleged injuries to third parties—migrant bus passengers—but Plaintiff does not satisfy the test for standing to assert the rights of these third parties. It is well established that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A litigant may pursue claims on behalf of third parties only when: (1) the litigant itself has suffered an injury in fact that gives the litigant a sufficiently concrete interest in the outcome of the issue in dispute; (2) the litigant has a close relationship to the third party; and (3) there is a hindrance to the third party's ability to protect his or her own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Even if Plaintiff has alleged a concrete interest in this dispute and therefore satisfies the first requirement, Plaintiff does not carry its burden to establish the second and third. On the second requirement, nothing in the Complaint indicates that Plaintiff has the required close relationship with migrant passengers. To make this showing, a plaintiff must allege a relationship that permits it to operate as "'fully, or very nearly, as effective a proponent'" of the third-party's rights as the third party itself. *Powers*, 499 U.S. at 413 (quoting *Singleton v. Wulff*, 428 U.S. 106, 115 (1976)). But despite bearing the burden to demonstrate standing, Plaintiff offers no facts showing that it will adequately represent the interests of migrant passengers.

Indeed, the only relationship Plaintiff alleges is that it has contracted with Texas—not migrants—to transport migrants out of Texas. Compl. ¶¶ 10–12. Plaintiff makes clear that it provides transportation services "[t]o meet the State of Texas' needs," *id*. ¶ 11, and that the transportation of migrants is part of a "transportation program" implemented by Governor Abbott, *id*. ¶¶ 10, 12, and "funded by the State of Texas," *id*. ¶ 12. Plaintiff's allegations reveal a business relationship with Texas that only incidentally involves migrants. Plaintiff is contractually beholden not to the migrants' interests but those of Texas and Governor Abbott.

As to the third requirement for third-party standing, Plaintiff provides no reason why migrant passengers are unable to bring claims on their own behalf, if they in fact believe that they have been aggrieved. Plaintiff therefore cannot assert migrants' alleged injuries as its own in this litigation, and Counts III and IV should be dismissed to the extent that they challenge the City's regulations based on alleged injuries to migrants.

## II. Plaintiff's Claims Should Be Dismissed For Failure To State A Claim.

### A. Plaintiff's claim under the Supremacy Clause should be dismissed (Count I).

Plaintiff asserts that the ordinance violates the Supremacy Clause because the City is preempted by federal law from "creating its own policy and regulations concerning

immigration." *Id.* ¶ 32. But the ordinance does no such thing, nor does it usurp federal authority over immigration.

Under the Supremacy Clause, there is a presumption that "state and local regulation of health and safety matters can constitutionally coexist with federal regulation." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985). As recognized by a case cited by Plaintiff, courts "assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528 (5th Cir. 2013) (quotation marks omitted).

For federal law to preempt local law, preemption must be expressly stated in a statute, or implied. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). One way implied preemption occurs is when Congress intends that federal law "occupy the field," known as "field preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Field preemption can be inferred "from a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and citation omitted). Another way implied preemption can occur is through "conflict preemption," which is when "compliance with both federal and state regulations is a physical impossibility," or "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted).[2]

---

[2] Preemption "of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cty.*, 471 U.S. at 713.

In the area of immigration more specifically, preemption examines whether a local law turns on a person's immigration or alienage status—whether the local law implicates "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (abrogated on other grounds). The City's regulations, however, do not do this, and therefore are not preempted. Nothing in the City's ordinance or CDOT's rules turns on or even mentions the immigration status of bus operators or passengers. They apply even-handedly to *any* operator of an intercity bus, regardless of the identity of the operator or passengers.

For this reason, the cases cited by Plaintiff are inapt. In *Arizona*, the Supreme Court invalidated a state law allowing state officers to arrest a person if the officer had probable cause to believe that the person is "removable from the United States." 567 U.S. at 407 (quotation marks omitted). This law was preempted because it explicitly turned on a person's immigration status, and thereby "violate[d] the principle that the removal process is entrusted to the federal government." *Id.* at 409. Similarly, in *Villas at Parkside Partners*, the Fifth Circuit invalidated an ordinance imposing criminal penalties on adults living in rental housing unless they showed that they were a lawful immigrant. By creating offenses that turned on a person's alienage status, the ordinance "conflict[ed] with federal anti-harboring law and the federal authority to arrest and detain persons for possible unlawful presence." 726 F.3d at 535–36. It put "local officials in the impermissible position of arresting and detaining persons based on their immigration status without federal direction and supervision." *Id.* at 532. *See also State v. Sarrabea*, 157 So. 3d 1 (La. App. 3 Cir. 2013) (invalidating a state law making it a crime to drive without documentation demonstrating lawful presence in United States).

8

In contrast to these cases, the City's regulations do not require an examination of immigration status or impose local remedies for violations of federal immigration law. They do not regulate conduct in the field of, or conflict with, immigration law. Instead, they are a public safety measure that enables the City to manage its streets and ensure that passengers can disembark in safe locations where resources and assistance are available. The City's regulations therefore "can constitutionally coexist with federal regulation." *Hillsborough Cty.*, 471 U.S. at 716.

As nothing in the text of the City's bus regulations implicates immigration, Plaintiff is left to argue that the ordinance "is specifically designed to prevent entry of migrants into Chicago." Compl. ¶ 32. This does not suffice to establish preemption. Preemption occurs when the *operation* of local law conflicts with federal law or intrudes into a preempted field; the intent of the law's drafters does not itself result in preemption. *See Arizona*, 567 U.S. at 416 (explaining that a law is not invalid unless it "in fact conflicts with federal immigration law and its objectives"); *Keller v. City of Fremont*, 719 F.3d 931, 942 (8th Cir. 2013) (rejecting a field preemption theory where the challenged ordinance did not have the effect of "regulat[ing] immigration generally or conduct in the 'field' of alien removal").

Even more, the suggestion that the ordinance was designed to prevent immigration is not "plausible on its face," and so fails for this separate reason. *Twombly*, 550 U.S. at 570. As the Complaint acknowledges, the City "has a long history of welcoming immigrants from around the world." Compl. ¶ 2. Nothing in the Complaint suggests that the ordinance is an effort by the City to turn its back on this history. While Plaintiff cites a stray statement from a single alderman and a proposed (and rejected) ballot measure, *id.* ¶¶ 13–16, these are irrelevant here. They had nothing to do with enactment or amendment of the ordinance, nor are they even suggestive of an

intent to block migration. And statements from particular legislators do not stand as the view or intent of the entire City Council in any event. *See United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1075–76 (D. Or. 2021) (citing *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021)) (finding that one representative's racial animus "cannot be attributed to the entire Congress, especially when others in Congress expressed the opposite sentiment"). Plaintiff's cursory, baseless allegations regarding the City's intent do not establish preemption.

At bottom, the City's ordinance and rules are neutral efforts to protect public safety and manage congestion. They apply with equal force regardless of passengers' immigration status, and do not bar migrants (or anyone) from entering the City via intercity buses (or any number of other transportation modes). Plaintiff's Supremacy Clause claim should be dismissed.

### B. Plaintiff fails to state a Dormant Commerce Clause claim (Count II).

Plaintiff next alleges that the ordinance discriminates against interstate commerce in violation of the so-called Dormant Commerce Clause. Plaintiff fails to state such a claim under any of the available routes.

First, Plaintiff does not show that the ordinance "explicitly discriminate[s]" against interstate commerce on its face. *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017). Plaintiff contends that the ordinance facially discriminates against interstate commerce by "target[ing]" out-of-state unscheduled intercity buses. Compl. ¶ 40. But the ordinance's plain text refutes this claim. It defines an "intercity bus" as one that originates from outside the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area, a confined, tri-state area in the immediate vicinity of Chicago. *See supra* at 3. While this definition encompasses buses from outside Illinois, it also includes buses travelling to Chicago *intra*state from most of Illinois, too. Indeed, buses from all of Illinois outside the small confines of the M.S.A. are covered by the City's ordinance, and buses from those regions are therefore subject to

10

the City's regulations just as is a bus from Texas.[3] For this reason, the ordinance does not expressly discriminate against intercity buses from out of state. *See Park Pet Shop*, 872 F.3d at 502 (concluding that Chicago ordinance did not facially discriminate against interstate commerce where it "evenhandedly prohibits all large commercial breeders—whether located in Illinois or out of state—from selling dogs, cats, and rabbits to Chicago pet stores").

Second, Plaintiff does not show that the ordinance has a "discriminatory effect" on interstate commerce. *See id.* at 501. Importantly, the requisite discriminatory effect does not exist merely where, as Plaintiff argues, a state law has an "extraterritorial" effect or "control[s] conduct beyond the boundaries of the state." Compl. ¶ 41. Indeed, just last term, the Supreme Court rejected the notion that there is an "almost per se rule against laws that have the practical effect of controlling extraterritorial commerce," and it reiterated that "[c]ompanies that choose to sell products in various States must normally comply with the laws of those various States" despite the effects of those laws. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364, 375 (2023) (cleaned up) (affirming dismissal of Dormant Commerce Clause claim against California statute that had the extraterritorial effect of causing out-of-state pork farmers to change how they confined their pigs and increased their production costs by nearly 10%).

Rather, to violate the Clause, the extraterritorial effects of a law must be *discriminatory* effects—that is, effects that "benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369. And to survive dismissal, Plaintiff must "plead specific facts to support a plausible claim that the ordinance has a discriminatory effect." *Park Pet Shop*, 872 F.3d at 503.

---

[3] Conversely, not all buses from outside Illinois qualify as intercity buses – namely, buses originating out of state but within the Metropolitan Statistical Area, such as those from Kenosha, Wisconsin or Gary, Indiana.

Here, none of Plaintiff's allegations plausibly establish that the ordinance discriminates in its effects against out-of-state commerce and in favor of Illinois bus companies. In *Park Pet Shop*, the Seventh Circuit held that the City's puppy mill ordinance did not have a discriminatory effect against out-of-state dog breeders because "breeders in Illinois enjoy no competitive advantage over their counterparts outside the state. All breeders are similarly disadvantaged." *Id.* at 502. The same is true here: the requirements of the City's intercity bus ordinance apply to all intercity bus companies equally, whether operating out of Illinois or other states. *See also Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1059 (7th Cir. 2018) (rejecting as "irrelevant" the plaintiff's complaints about the burdens of a butter marketing law that were "not specific to out-of-state butter makers" but affected "all" butter makers "regardless of whether they reside in Wisconsin or out-of-state").

Last, Plaintiff cannot establish a Dormant Commerce Clause violation by recourse to the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Seventh Circuit cases indicate that *Pike* is not available unless at least *some* discriminatory effect is shown, *see, e.g.*, *Park Pet Shop*, 872 F.3d at 501–02, and, as just explained, there is no discriminatory effect here. But even if *Pike* is available when a law is purely neutral toward interstate commerce (*i.e.*, there is no discriminatory effect), *see Nat'l Pork Producers Council*, 598 U.S. at 379–80, Plaintiff does not state a claim under *Pike*.[4]

*Pike* can be used to invalidate laws that impose burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits." *Id.*; *see also Park Pet Shop*, 872 F.3d at 501-02 (explaining *Pike*). On the burden side of the ledger, Plaintiff must plead facts

---

[4] Even if *Pike* analysis "[remains] open" in a "small number" of cases where a law has no discriminatory effect, such cases lie "well outside *Pike*'s heartland" and are "not [off to] an auspicious start." 598 U.S. at 380.

"'plausibly' suggesting a substantial harm to interstate commerce; facts that render that outcome a 'speculative' possibility are not enough." *Nat'l Pork Producers Council*, 598 U.S. at 386 (plurality opinion) (quoting *Twombly*, 550 U.S. at 555).

Plaintiff offers no facts plausibly showing that the City's regulations impose a substantial harm on interstate commerce. The most the Complaint offers are vague allegations that the ordinance "hampers" Plaintiff's operations, "may" lead to trip delays, or makes it "extremely difficult" to transport people. Compl. ¶¶ 44, 60. These do not suffice. For one, they are conclusory. Plaintiff does not, for example, explain why it cannot seek approval from the City 48 hours before a bus arrives, or why its buses cannot unload passengers at locations designated by the City.

More importantly, though, the allegations fail as a matter of law, because a burden on *Plaintiff* does not equate to a burden on interstate commerce. It is not enough for Plaintiff to point to its own alleged burdens, for the Commerce Clause does not protect "the particular structure or methods of operation" used by a particular company. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978). Rather, it "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* at 127–28. Plaintiff's own alleged burdens also fail as a matter of law for an additional reason: the effects of the City's regulations fall equally on in-state and out-of-state firms, and so any burden they impose (on Plaintiff or others) is not a burden on *interstate* commerce. *See Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 383 F. Supp. 3d 353, 384 (M.D. Pa. 2019) (dismissing a Dormant Commerce Clause claim where allegations showed only that the challenged law "impose[d] a burden on *commerce* as opposed to a burden on *interstate* commerce") (emphasis in original), *aff'd*, 934 F.3d 283 (3d Cir. 2019); *VIZIO, Inc. v. Klee*, 886 F.3d 249, 260 (2d Cir.

13

2018) (affirming dismissal where the plaintiff failed to show "burdens on interstate commerce that exceed the burdens on intrastate commerce"). For these reasons, Plaintiff fails to allege a substantial burden on interstate commerce under *Pike*.

Plaintiff fails on the other side of the *Pike* balance as well. The Complaint does not cast any doubt on the public safety, traffic management, and resource allocation benefits of the ordinance and rules. *See Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019) (explaining that a plaintiff asserting a *Pike* claim must plausibly allege facts showing that the "local benefits claimed by the [government] are all illusory or illegitimate"). *See also infra*, Section II.C.1.b (discussing the various benefits of the City's regulations and why they satisfy the rational basis standard).

Put simply, the Complaint offers no plausible basis on which the Court could conclude that the ordinance and CDOT's rules place substantial burdens on out-of-state commerce or that any such burdens clearly outweigh the local benefits of the ordinance. Plaintiff therefore fails to establish a Commerce Clause violation through the *Pike* method, and, combined with the other failures above, there is no basis for Plaintiffs' Dormant Commerce Clause claim.

### C.      Plaintiff fails to state an equal protection claim (Count III).

Plaintiff alleges that the City's intercity bus regulations violate equal protection in two ways: (1) they regulate unscheduled intercity buses differently from regularly scheduled intercity buses, and (2) the ordinance is intentionally discriminatory based on the national origin, ethnicity, or race of bus passengers. Both of these theories fail.

### 1.      Plaintiff fails to state a claim based on the different treatment of unscheduled and scheduled intercity buses.

The City's classification of intercity buses as unscheduled or scheduled is a business classification; it does not implicate a protected class or a fundamental right, and therefore it is

subject to mere rational basis review. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). To state a claim under this standard, Plaintiff must show that unscheduled intercity buses are similarly situated to scheduled intercity buses, and there is no rational reason for the City's differential treatment of the two. *See Smith v. City of Chicago*, 457 F.3d 643, 650–51 (7th Cir. 2006); *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). Plaintiff fails both requirements.

### a. The two bus types are not similarly situated.

First, unscheduled intercity buses are not similarly situated to scheduled ones. To be similarly situated, a plaintiff and its comparator "must be identical or directly comparable in all material respects." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010) (internal quotations omitted). Here, though, Plaintiff offers no explanation of why unscheduled intercity buses and scheduled ones are similarly situated. This alone warrants dismissal. *See, e.g.*, *Saiger v. City of Chicago*, 37 F. Supp. 3d 979, 983 (N.D. Ill. 2014) ("when the plaintiff fails to allege facts tending to show the two groups are similarly situated, then dismissal under Rule 12(b)(6) is appropriate"); *Cahn v. City of Highland Park*, No. 11 C 6082, 2012 WL 917855, at *4 (N.D. Ill. Mar. 14, 2012) (dismissing claim where plaintiff failed to explain how any other person was similarly situated to him); *BFC Enterps., LLC v. City of Murray, Ky.*, No. 5:17-CV-111-TBR, 2018 WL 1457223, at *4 (W.D. Ky. Mar. 22, 2018) (dismissing claim where plaintiff business failed to explain how other entities were similarly situated).

Regardless, it is clear from the face of the City's regulations that the two categories are not similarly situated, for they have different business models and different methods of operating. A regularly scheduled intercity bus "operates trips on a predictable and recurring basis, following a schedule that is published in advance and available to the general public, and provides services in exchange for paying a fare." Exhibit B, Rule 1. Thus, passengers on a

regularly scheduled intercity bus service will generally look up a bus company's schedule, select a bus that will be leaving at a predesignated time and from a predesignated area and will arrive at a predesignated time and predesignated area, and then contract directly with the company for their ticket. In contrast, an unscheduled intercity bus lacks these hallmarks. *See id.* It does not follow a prearranged, regular schedule between established loading and unloading points. Nor do passengers necessarily pay for their trip by buying a ticket from the company. As Plaintiff's allegations show, an unscheduled intercity bus operator (like itself) may contract with an outside entity instead of directly with passengers. *See* Compl. ¶¶ 10–12. The Seventh Circuit has held that differences of this sort between transportation providers render them not similarly situated. *See Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 598–99 (7th Cir. 2016) (explaining that taxis were not similarly situated to ride share companies due in part to differences in how rides were scheduled and the information riders receive); *see also Checker Cab Phila. v. Phila. Parking Auth.*, 306 F. Supp. 3d 710, 735 (E.D. Pa. 2018); *Bos. Taxi Owners Ass'n, Inc. v. City of Boston*, 84 F. Supp. 3d 72, 81 (D. Mass. 2015). For these reasons, Plaintiff's equal protection challenge to the intercity bus distinctions fails at the outset because unscheduled and scheduled buses are not similarly situated.

### b.    Treating the two bus types differently is rational.

The claim also fails because, even if the two bus types were sufficiently similar, the City's differing regulations are rationally related to legitimate government interests. The rational basis standard is "a paradigm of judicial restraint," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993), and recognizes that the City is accorded "wide" regulatory latitude, *Dukes*, 427 U.S. at 303. In reviewing Plaintiffs' claim, the Court is not to judge the "wisdom, fairness, or logic" of the City's classifications. *Beach Commc'ns*, 508 U.S. at 313. Rather, the City's regulations will

16

be upheld so long as there is a "conceivable" rationale for the City's approach, even if that reason did not "actually motivate[]" the City or is not based on evidence or empirical data. *Id.* at 315.

Here, the differences in regulation that Plaintiff invokes come from CDOT's rules implementing the ordinance, not the ordinance itself. These differences, which concern the locations, times of day, time windows, and numbers of drop-offs that may occur, all further various legitimate interests of the City.[5]

First, the City's application, approval, and drop-off requirements for unscheduled intercity buses promote the City's legitimate interest in public safety. *See Dahlstrom v. Sun-Times Media, LLC*, 346 F. Supp. 3d 1162, 1168 (N.D. Ill. 2018). Unscheduled intercity buses operate irregularly, following no established and published schedule. By requiring these buses to obtain City approval for a particular drop off time and location in advance, the City's requirements protect the safety of the buses' passengers by ensuring that passengers are dropped off in areas where they will be safe, and at reasonable times when businesses or service providers will be available to assist the passengers should they need it. Indeed, this concern is expressly listed in the ordinance as being a basis for denying a request for a particular arrival time and location. *See* MCC § 9-48-050(f) (allowing denial where unloading passengers at the proposed time and location "presents an unreasonable threat to the health, safety and welfare of the public").

---

[5] Plaintiff often mischaracterizes the City's ordinance and rules. For instance, Plaintiff alleges that regularly scheduled intercity buses "can drop off passengers anytime and for an unlimited number of trips" and suggests that only unscheduled buses "must obtain pre-approval from the Commission [sic] before dropping off any passengers, anywhere." Compl. ¶ 53. However, both categories of buses are subject to application and pre-approval requirements. *See* MCC § 9-48-050(f). Plaintiff also alleges that unscheduled intercity buses "can only have two drop offs in Chicago per day." Compl. ¶ 53. However, the regulations only restrict unscheduled intercity buses to two applications for a given date, *time, and location*, as well as to two drop-offs or pick-ups *per hour*. Exhibit A, Rule 4. The rules therefore permit many more arrivals than just two per day.

Second, and for very similar reasons, the City's rules further the City's interest in regulating traffic congestion and promoting safe roadways. *See A.J. Cal. Mini Bus, Inc. v. Airport Comm'n of the City & Cty. of S.F.*, 148 F. Supp. 3d 904, 917 (N.D. Cal. 2015). Unscheduled intercity buses pose a greater risk to the City's ability to manage traffic than do scheduled buses, because the City does not know when and where they will arrive, or how many of them there will be. A surprise unloading of a large bus full of out-of-town passengers can tie up sidewalks and parking lanes, and cause traffic to slow or stop. The City's application requirement and regulation of the times, locations, and frequency of arrivals allows the City to manage arrivals and traffic congestion or dangers. As is the case with the City's interest in public safety, these traffic concerns are listed in the ordinance as something the CDOT Commissioner is to consider when reviewing an application. *See* MCC § 9-48-050(f) (allowing denial where the proposed unloading "impedes the safe and efficient flow of traffic").

Finally, the City's regulations serve the City's legitimate interest in administrative efficiency. By setting up a clear system to regulate intercity bus arrivals, the City is able to efficiently allocate resources as needed, such as assisting with passenger aid or traffic control. *See Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 601 (7th Cir. 2016) (recognizing efficient use of government resources as a legitimate interest); *Richards v. Lavelle*, 620 F.2d 144, 149 (7th Cir. 1980) (recognizing legitimate interest of administrative efficiency in government function). Yet again, this is a concern captured by the ordinance. *See* MCC § 9-48-050(f) (allowing denial where proposed unloading "imposes an unreasonable burden on available resources").

For all these reasons, any difference in treatment between unscheduled and scheduled intercity buses is rationally related to legitimate City interests. CDOT's rules are a reasonable

way to manage the unique problems posed by unscheduled intercity buses. For this additional

reason, Plaintiff fails to state an equal protection challenge to the CDOT rules.

> **2.      Plaintiff fails to state an equal protection claim based on its passengers.**

In Count III, Plaintiff also claims that the ordinance violates equal protection because it

discriminates based on the national origin, alienage, and race of bus passengers. Compl. ¶ 48.

This claim should be dismissed at the outset because, as explained above in Section I, Plaintiff

lacks standing to bring a claim on behalf of migrant passengers. But even if Plaintiff had

standing, the claim would fail on the merits. The ordinance contains no language mentioning,

much less making classifications based on, national origin, alienage, or race. Instead, it applies to

owners and operators of "any" intercity bus, regardless of who the owner or operator is, where

they are from, or who their passengers are or where they are from. MCC § 9-48-050(f). Indeed,

Plaintiff admits that the ordinance is "facially neutral." Compl. ¶ 48.

To otherwise state an equal protection claim based on unlawful discrimination, Plaintiff

must establish that the City's regulations have a disparate impact on a protected class *and* are

motivated by a specific intent to discriminate. *United States v. Leonides-Seguria*, 627 F. Supp. 3d

938, 940–41 (N.D. Ill. 2022) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

U.S. 252 (1977)). But, as to the first element, Plaintiff makes no plausible allegations that the

City's intercity bus regulations produce a disparate impact on individuals of a certain national

origin, alienage, or race. It offers no statistics or other facts showing how members of various

racial or ethnic groups are impacted by the City's regulations.

And as to the second element, Plaintiff pleads no facts plausibly showing that the

regulations were motivated by an intentionally discriminatory animus. *See Iqbal*, 556 U.S. at 678

("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."); *Quinones v. New York City*, 2022 WL 4787402, at *1 (S.D.N.Y. Oct. 3, 2022) (dismissing equal protection claim making only conclusory allegations that a policy restricting the ability to speak Spanish was motivated by an intent to discriminate based on nationality and race). As already explained, the actions or statements of certain City Council members on matters *other* than the ordinance do not suffice to show that the ordinance was motivated by an illicit intention to burden migrants. *See supra* at Section II.A. Nor is discriminatory intent established by Plaintiff's conclusory allegation that the City's regulations target only unscheduled intercity buses carrying migrants. Compl. ¶ 49. Again, as already explained, the City's regulations do not target migrant passengers but apply to *all* intercity buses, no matter who their passengers are. *See supra* at Section II.A. For these reasons, Plaintiff fails to state an equal protection claim based on the race or national origin of its passengers.

> D.   **Plaintiff fails to state a right to travel claim (Count IV).**

In Count IV, Plaintiff alleges a violation of the fundamental right to travel under the Due Process Clause. There are three components of the right to travel: (1) the right of a citizen of one state to enter and to leave another state; (2) the right to be treated as a welcome visitor when temporarily present in the second state; and (3) for those travelers who elect to become permanent residents in a new state, the right to be treated like other citizens of that state. *See Hope v. Comm'r of Ind. Dep't of Corrs.*, 9 F.4th 513, 523 (7th Cir. 2021) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). Plaintiff appears to invoke only the first aspect of the right to travel. *See* Compl. ¶ 58 (collecting cases addressing freedom of movement and the right to travel through public spaces and on public roadways). Plaintiff's claim fails because Plaintiff, as a business, does not have the right it asserts and does not properly allege a violation of the right anyway.

### 1. Plaintiff does not have a fundamental right to travel.

Plaintiff is a bus company and therefore has no fundamental right to travel. The right to travel has been recognized as the right of an *individual* to travel. *See Smith v. Turner*, 48 U.S. 283, 492 (1849) (acknowledging the right in relation to "American citizens who are passengers from the ports of other States"); *Crandall v. State of Nevada*, 73 U.S. 35, 44 (1867) (recognizing an individual's right to travel and striking down a railroad tax levied on individual passengers, as opposed to railroad operators, as violative of that right); *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) (recognizing the right to travel as a part of an individual's historic right to such movement); *United States v. Guest*, 383 U.S. 745, 758 (1966) (tying the right back to the Articles of Confederation's provision that "'the people of each State shall have free ingress and regress to and from any other State'") (citing Art. IV, Articles of Confederation); *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (explaining the historical acceptance of a right to migrate and "abide" from state to state). Any claim asserting a right to travel by Plaintiff itself should be dismissed because it does not have such a right.

### 2. The City's regulations do not violate the right to travel.

Even if it had a right to travel, Plaintiff fails to allege a violation of that right. To start, and assuming that there is some physical way for a corporate entity to "travel" between states, the City's regulations leave Plaintiff entirely free to travel in its own right to and from Chicago, or elsewhere. The regulations come into play only when Plaintiff wishes to use its buses to *transport others*—passengers—on an intercity bus, but that is not a burden on Plaintiff's ability to travel. It is at most a burden on Plaintiff's ability to conduct a certain type of business. And

insofar as the ability of passengers to travel on Plaintiff's buses is incidentally implicated, Plaintiff lacks standing to assert any claim on behalf of the passengers. *See supra* at Section I.

More importantly, any burden from the City's regulations simply does not violate the right to travel, whether held by Plaintiff or its passengers. The City's regulations are akin to regulations like gasoline taxes and toll roads that may lead to some extra delay, cost, or other burden on intercity bus travel, but nonetheless "simply do not amount to the denial of a fundamental right." *Owner Operator Indep. Drivers Ass'n, Inc. v. Pennsylvania Tpk. Comm'n*, 934 F.3d 283, 295 (3d Cir. 2019) (citing *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991)) (internal quotations omitted) (collecting cases). The right to travel is not violated "merely because [a law] makes it somewhat less attractive" to travel. *Pollack v. Duff*, 793 F.3d 34, 46 (D.C. Cir. 2015).

And even if the City's regulations were so burdensome that they had the effect of halting intercity buses altogether (something Plaintiff does not even try to allege), that still would not matter, because the denial of a single mode of transportation does not impermissibly burden the right to travel. *See Matthew v. Honish*, 233 F. App'x 563, 564 (7th Cir. 2007); *see also Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (holding the right to travel is not a right to "the most convenient form of travel"); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) ("[B]urdens on a single mode of transportation do not implicate the right to interstate travel."). People wishing to travel to Chicago remain free to pursue any number of other transportation modes—such as scheduled intercity bus service, trains, planes, or other vehicles. For all these reasons, Count IV should be dismissed.

**E.    The special legislation claim should be dismissed (Count V).**

Plaintiff invokes the Illinois Constitution's Special Legislation Clause in Count V,[6] but

fails to state a violation of that provision. This claim is essentially the same as Plaintiff's equal

protection claim, and should be dismissed for the same reasons.[7]

Under the Special Legislation Clause, a statute containing a classification that

"discriminates in favor of a select group" will survive challenge so long as the classification is

not arbitrary. *Elementary Sch. Dist. 159 v. Schiller*, 849 N.E.2d 349, 361–62 (Ill. 2006).

Moreover, "[i]t is well settled that review of a special legislation challenge is governed by the

same standard that applies to review of equal protection challenges," *Cutinello v. Whitley*, 641

N.E.2d 360, 363 (Ill. 1994), with the relevant equal protection analysis being the same under

both the United States and Illinois Constitutions, *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 46,

*cert. denied*, No. 23-510, 2024 WL 72021 (U.S. Jan. 8, 2024).

Plaintiff's special legislation claim is, in the main, just its equal protection claim by

another name, and it fails for the same reasons discussed above with respect to Count III.

Plaintiff again alleges that the City's regulations discriminate in favor of a select group and

makes an arbitrary classification between regularly scheduled and unscheduled intercity buses.

Compl. ¶ 68. As explained above in Section II.C, Plaintiff fails to state a claim based on these

theories. Similarly, Plaintiff's allegation in Count V that the ordinance infringes on the

fundamental right of travel fails for the reasons discussed above in Section II.D.

---

[6] Plaintiff mislabels Count V as Count VI in its Complaint, but the City will refer to Plaintiff's Special Legislation Clause claim as Count V in this analysis.

[7] If the Court finds that Plaintiff's preceding federal claims should be dismissed, there is also an independent basis to dismiss this state law claim for lack of supplemental jurisdiction. *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) ("when all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims") (internal quotations omitted).

The one new aspect of Count V is Plaintiff's reference to additional potential comparators, including buses operating within the M.S.A. and other regional buses. Plaintiff contends that these are entities on which the ordinance confers a special benefit or exclusive privilege. Compl. ¶ 69. But this attempt at a wider net does not save its claim. For one, Plaintiff does not allege facts showing that it is similarly situated to these so-called comparators. That deficiency alone warrants dismissal. *See Caulkins*, 2023 IL 129453, ¶ 68 (plaintiffs failed the similarly situated requirement of a special legislation claim when their pleadings did not show that the two groups were similarly situated). *See also Kaczka v. Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chi.*, 923 N.E.2d 1282, 1287 (Ill. App. 1st 2010) (affirming dismissal of equal protection claim where plaintiff failed to identify "others similarly situated to him"). Even more, unscheduled intercity buses are not similarly situated to these other buses because they operate differently, serve different ridership areas, and have different business models and service frequency. Plaintiff makes no attempt to explain why, for instance, an unscheduled intercity bus arriving from Texas is similar to a regional PACE bus travelling the short distance from Palos Hills to Chicago on a schedule.

The City also has rational reasons for treating unscheduled intercity buses differently from the regional bus types listed in Count V. As already explained in Section II.C.1.b., unscheduled intercity buses pose unique risks to public safety and the orderly management of traffic. And compared to local passengers riding local buses in particular, intercity passengers are more likely to arrive without long-term places to stay and to be less familiar with navigating the City and its businesses and other resources, such as restaurants, shops, or hotels. That makes it all the more important for the City to regulate unscheduled intercity buses differently, so that these or other resources will be available. In addition, local buses are likely to have a better sense

of the area and traffic patterns, and so pose less of a congestion risk. Each of these rational reasons justifies the City's regulations specific to unscheduled intercity buses. Plaintiff therefore fails to state a claim under the Special Legislation Clause.[8]

### F.    Count VI should be dismissed.

In Count VI, Plaintiff does not allege a separate substantive claim, but merely invokes 42 U.S.C. § 1983 as a basis for recovering damages for the alleged constitutional deprivations asserted in the other counts of the Complaint. Because each of those counts fails to state a claim, Count VI should be dismissed, too. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred.") (internal citations omitted).

### CONCLUSION

WHEREFORE, the City respectfully requests that the court dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and grant the City such other relief as it deems just and proper.

---

[8] In Count V, Plaintiff also invokes intercity buses that are approved by the CDOT Commissioner as potential comparators. Those are not proper comparators because the point of comparison is whether they have been approved by the City, not whether they share operational attributes that are similar to Plaintiff. Plaintiff also invokes intercity buses that "transfer passages to trains," but Plaintiff misreads the ordinance. The ordinance does not exclude such buses from the definition of intercity bus. The ordinance simply states that a particular type of intercity bus—one that "is exclusively used to transfer passengers" to Amtrak and Metra trains—is exempt from a general prohibition on intercity buses depositing passengers on Canal Street next to Union Station. *See* MCC § 9-48-050(e).

Date:   February 8, 2024

ANDREW WORSECK
andrew.worseck@cityofchicago.org
ELLEN MCLAUGHLIN
ellen.mclaughlin@cityofchicago.org
JOHN V. CASEY
john.casey@cityofchicago.org
DAVID BRANDON SMITH
david.smith4@cityofchicago.org
City of Chicago, Department of Law
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7129 / 2-0307 / 4-7220

*Attorneys for the City*

Respectfully submitted,

MARY B. RICHARDSON-LOWRY,
Corporation Counsel

By:      */s/ Andrew Worseck*
              Deputy Corporation Counsel

26

# Exhibit A



## Office of City Clerk

### City Council Document Tracking Sheet

City Hall
121 North LaSalle Street
Room 107
Chicago, IL 60602
www.chicityclerk.com

**Matter ID:** O2023-0006210

**Meeting Date:** 12/13/2023

**Sponsor(s):** Dept./Agency (Dept./Agency) *

**Type:** Ordinance

**Title:** Amendment of Municipal Code Section 9-48-050 regarding requirements for intercity buses and penalties for noncompliance

**Committee Assignment:** Committee on Pedestrian and Traffic Safety



DEPARTMENT OF LAW

CITY OF CHICAGO

December 8, 2023

TO THE HONORABLE, THE CHAIRMAN AND
MEMBERS OF THE CITY COUNCIL COMMITTEE ON
PEDESTRIAN AND TRAFFIC SAFETY

Ladies and Gentlemen:

Together with the Commissioner of Transportation, I transmit herewith an ordinance amending Section 9-48-050 of the Municipal Code and associated Municipal Code provisions regarding requirements for intercity buses and penalties for noncompliance.

Your consideration of this ordinance will be appreciated.

Very truly yours,

Mary B. Richardson-Lowry
Corporation Counsel

121 NORTH LASALLE STREET, ROOM 600, CHICAGO, ILLINOIS 60602

## O R D I N A N C E

**WHEREAS**, The City of Chicago is a home rule unit of government as defined in Article VII, Section 6(a) of the Illinois Constitution; and

**WHEREAS**, As a home rule unit of government, the City of Chicago may exercise any power and perform any function pertaining to its government and affairs; and

**WHEREAS**, Protecting the safety and well-being of bus passengers, and of motorists and others in the vicinity of buses that are off-loading and onboarding passengers, by ensuring that boarding and alighting from buses is done in safe circumstances is an urgent matter pertaining to the government and affairs of the City of Chicago; now, therefore,

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:**

**SECTION 1.** Section 9-48-050 of the Municipal Code of Chicago is hereby amended by deleting the language struck through and by inserting the language underscored, as follows:

**9-48-050 Buses – ~~Stopping, standing and parking~~ Loading and unloading.**
(a) The driver of a bus shall not stop such vehicle upon any street at any place for the purpose of loading or unloading passengers other than at a designated bus stop, bus stand, passenger loading zone, or bus terminal except in case of an emergency or as permitted in subsection (d) of this section.
(b) The driver of a bus shall enter a bus stop or passenger loading zone on a public way only in such a manner that the bus when stopped to load or unload passengers shall be in a position with the right front wheel of such bus not further than 18 inches from the curb, or 30 inches from the curb if the bus is lift- equipped, and the bus approximately parallel to the curb so as not to unduly impede the movement of other vehicular traffic.
(c) When any lane is designated and appropriately indicated by signs and markings for shared use by buses and bicycles, a driver of a bus shall yield to a bicycle proceeding in the same direction until it is safe to overtake such bicycle.
(d) Subject to any restriction established pursuant to subsection (f), the driver of a bus may stop such vehicle at any intersection of any street on which it has authority to operate between the hours of Midnight and 5:00 a.m. for the purpose of loading or unloading passengers.
(e) Except in case of an emergency or as approved pursuant to subsection (f) of this section, a driver of an intercity bus shall not stop or park any intercity bus on Canal Street, between Adams Street and Jackson Boulevard for the purpose of loading or unloading of passengers, luggage or other goods. For the purpose of this section, "intercity bus" means any bus used for transportation of persons between the City of Chicago and locations outside of the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area (M.S.A.) (as defined by the Director of the United States Office of Management and Budget), but shall not include buses of the Chicago Transit Authority or another component of the Regional Transportation Authority, including, but not limited to, the suburban bus commonly known as "Pace." The prohibition in this subsection shall not apply to intercity buses or shuttle buses that are exclusively used to transfer passengers to trains operated by the National Railroad Passenger Corporation, commonly known as "Amtrak" and/or the Northeast Illinois Rail Corporation, commonly known as "Metra" at Chicago Union Station.
(f) No owner or operator of any intercity bus shall use any designated bus stop, bus stand, or passenger loading/unloading zone, or any other location, for ~~regular~~ loading or unloading of passengers, luggage or other goods without first obtaining the approval of the Commissioner.

Application for such approval shall be made upon a form provided by the Commissioner, and shall contain the name and address of the applicant, the location of the proposed bus stop, bus stand, or passenger loading/unloading zone, or other location where such ~~regular~~ loading or unloading of passengers, luggage or other goods shall take place, the time of day and length of time any such bus shall stand in the proposed bus stop, bus stand, or passenger loading/unloading zone, or other location, and the number of buses that shall leave from and come to the proposed bus stop, bus stand, or passenger loading/unloading zone, or other location per day. Such application shall be signed by the applicant.

The Commissioner shall approve or deny the application no later than 30 days after the application was filed. The Commissioner's review of the application shall take place in consultation with the local alderperson, and shall take into consideration administrative efficiency and available resources, public safety, and orderly traffic flow, and a permit shall be subject to such conditions and restrictions that the Commissioner may impose in his sole discretion (including, without limitation, those addressing day/time availability of any such location(s), number of daily arrivals/departures to/from any such location(s), and advance notification requirements by the applicant)~~,~~. If the Commissioner denies the application, it shall be based upon a determination that the loading/unloading of passengers, luggage or other goods at that time, or in that particular designated bus stop, bus stand, or passenger loading/unloading zone, or other location presents an unreasonable threat to the health, safety and welfare of the public or impedes the safe and efficient flow of traffic or imposes an unreasonable burden on available resources. If the Commissioner denies the application, the Commissioner shall send by e-mail or U.S. mail a notification to the applicant in writing specifying the reasons for the decision. Any applicant may seek review of the decision of the Commissioner denying such application in the manner provided by law. The loading or unloading of an intercity bus in violation of this subsection (f) shall subject the violator to a fine of no less than $2,000 and no more than $10,000. Each instance of unauthorized loading or unloading shall constitute a separate violation. The provisions of this subsection shall not apply to any bus used in conducting a "sightseeing tour" as that term is defined in Section 9-114-010 of this Code.

(g) Pursuant to Code Section 2-102-030(l), the Commissioner is authorized to issue any rules or policies necessary or useful to implement and enforce this section.

(h) Any motor vehicle used in violation of subsection (f) of this section shall be subject to seizure and impoundment pursuant to this section. In addition to any other applicable penalty, the owner of record of such motor vehicle shall be subject to an administrative penalty of $3,000 plus any towing and storage fees applicable under Section 9-92-080.

(i) Whenever a police officer who is present at the time of an alleged violation of subsection (f) has probable cause to believe that a vehicle is subject to seizure and impoundment pursuant to this section, the police officer shall provide for the towing of the vehicle to a facility controlled by the City or its agents. Before or at the time the vehicle is towed, the police officer shall notify any person identifying themselves as the owner of the vehicle at the time of the alleged violation or the person who is found to be in control of the vehicle at the time of the alleged violation, if there is such person, of the fact of the seizure and of the vehicle owner's right to request a vehicle impoundment hearing to be conducted under Section 2-14-132 of this Code by serving such person with a copy of the vehicle impoundment seizure report.

(j) Section 2-14-132 shall apply whenever a motor vehicle is seized and impounded pursuant to this section.

**SECTION 2.** Section 2-14-132 of the Municipal Code of Chicago is hereby amended by inserting the language underscored, as follows:

**2-14-132 Impoundment.**

(a) (1) Whenever the owner of a vehicle seized and impounded pursuant to Sections 3-46-076, 4-68-195, 4-227-140, 9-76-140, 9-80-220, 9-112-640 or 9-114-420 of this Code (for purposes of this section, the "status-related offense sections"), or Sections 7-24-225, 7-24-226, 7-28-390, 7-28-440, 7-38-115(c-5), 8-8-060, 8-20-070, 9-12-090, 9-12-095, 9-12-100, 9-12-105, 9-12-110, 9-32-040, <u>9-48-050,</u> 9-76-160, 9-80-225, 9-80-240, 9-92-035, 11-4-1410, 11-4-1500 or 15-20-270 of this Code (for purposes of this section, the "use-related offense sections") requests a preliminary hearing in person and in writing at the Department of Administrative Hearings, within 15 days after the vehicle is seized and impounded, an administrative law officer of the Department of Administrative Hearings shall conduct such preliminary hearing within 48 hours of request, excluding Saturdays, Sundays and legal holidays, unless the vehicle was seized and impounded pursuant to Section 7-24-225 and the Department of Police determines that it must retain custody of the vehicle under the applicable state or federal forfeiture law. If, after the hearing, the administrative law officer determines that there is probable cause to believe that the vehicle was used in a violation of this Code for which seizure and impoundment applies, or, if the impoundment is pursuant to Section 9-92-035, 9-12-095 or 9-12-105, that the subject vehicle is eligible for impoundment under that section, the administrative law officer shall order the continued impoundment of the vehicle as provided in this section unless the owner of the vehicle pays to the City the amount of the administrative penalty prescribed for the code violation plus fees for towing and storing the vehicle.

*(unaffected text omitted for the convenience of the reader)*

**SECTION 3.** The changes made to the title of Section 9-48-050 and subsection (f) of Section 9-48-050 of the Municipal Code of Chicago by this amendatory ordinance of December 2023, are intended to confirm rather than change existing law. These changes shall be made effective as if they were included in the enactment of the ordinance that inserted or substantively amended the subsection.

**SECTION 4.** Because protecting the safety and well-being of being of bus passengers, and of motorists and others in the vicinity of buses that are off-loading and onboarding passengers, is a matter of urgency, pursuant to 65 ILCS 5/1-2-4, this Ordinance shall take effect immediately upon its passage and approval, if such passage is by a vote of at least two-thirds of the members of this Council. In the event this Ordinance passes by a majority vote of less than two-thirds of the members of this Council, it shall take effect ten days after passage and publication.

APPROVED

_____

CORPORATION COUNSEL

APPROVED

_____

MAYOR

DATED: __12/13/23__

DATED: __12/13/23__

# Exhibit B

BY AUTHORITY VESTED IN THE COMMISSIONER OF TRANSPORTATION PURSUANT TO SECTIONS 2-102-030(l) and 9-48-050 OF THE MUNICIPAL CODE OF CHICAGO, I HEREBY PROMULGATE THE FOLLOWING RULES APPLICABLE TO M.C.C. SECTION 9-48-050 (BUSES – STOPPING, STANDING AND PARKING):

By Order of the Commissioner

Signed: _____     Date:_November 16, 2023_____

           Thomas Carney, Acting Commissioner, CDOT

Published:  11/16/23

Effective:   11/16/23

## Rule 1: Definitions

For the purposes of these Rules, these definitions shall apply.

"Application" means a form that the Commissioner makes available for receiving and reviewing proposed intercity bus operations.

"Approval" means written notice that the Commissioner has received, reviewed and determined that an application satisfies the requirements of the M.C.C. and these Rules.

"Commissioner" means the Commissioner of Transportation or his/her designee.

"Regularly scheduled service" means intercity bus service that operates trips on a predictable and recurring basis, following a schedule that is published in advance and available to the general public, and provides service in exchange for paying a fare.

"Unscheduled intercity bus" means an "intercity bus" as defined in M.C.C. section 9-48-050(e), that is not operating pursuant to Commissioner authorization via: (i) an approved letter of permission or (ii) an approved schedule and/or approved pick-up/drop-off zone, as of the effective date of these Rules.

## Rule 2: Applicability

The Commissioner's preexisting application, review and approval process for intercity buses, as may be amended from time to time, shall apply to: (i) applicants for regularly scheduled service, and (ii) operators with an approved letter of permission, schedule and/or approved pick-up/drop-off zone as of the effective date of these Rules.

## Rule 3: Notice and Application Required

The operator of any intercity bus must make application for an approval to arrive and load/unload passengers in the City of Chicago on the appropriate form made available by the Commissioner. All applications for unscheduled intercity bus service must be received by the Commissioner a minimum of 2 full business days prior to the requested date of arrival in the application. For example, an application for a Thursday drop-off, regardless of time, must be received by the Commissioner by close of business on the preceding Monday. Similarly, an application for a Monday drop-off, regardless of time, must be received by the Commissioner by close of business on the preceding Wednesday.

## Rule 4: Processing and Approval of Applications

Applications for unscheduled intercity buses will be reviewed on a first-come, first-serve basis. No more than two applications, regardless of operator, shall be approved by the Commissioner for a given date, time, and location. Drop-offs and/or pick-ups for unscheduled intercity buses shall be limited to two per hour, regardless of operator.

## Rule 5: Days and Hours of Operation

Unscheduled intercity buses shall not load/unload passengers within the City of Chicago between the hours of 5:30pm and 8am Monday to Friday, nor at any time on Saturdays, Sundays, or designated City of Chicago Holidays.

## Rule 6: Passenger Pick-up/Drop-Off Locations

Unscheduled intercity buses shall only load/unload passengers at locations designated by the Commissioner. The Commissioner has designated the following location(s)

- 800 S. Desplaines St.
  (west curbside of S. Desplaines St. immediately south of W. Polk St.)
  Chicago, IL, 60607

## Rule 7: Punctuality

For any given approval, unscheduled intercity buses must arrive no sooner than, and no later than 30 minutes after, the approved arrival time, otherwise the application shall be considered invalidated.

## Rule 8: Proof of Application and Approval

Operators of unscheduled intercity buses must carry a physical or electronic copy of an approved application and present it for inspection at the place of loading/unloading upon request by any employee or designee of the City of Chicago.