# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Wynne Transportation LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24-cv-171 |
| v. | ) | |
| | ) | Hon. John J. Tharp |
| City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS

# **Table of Contents**

Table of Contents..............................................................................................................ii

Table of Authorities .......................................................................................................iii

Introduction ..................................................................................................................... 1

Facts ................................................................................................................................. 2

Standard of Review.......................................................................................................... 5

Argument & Authorities.................................................................................................. 6

   I.     Wynne has standing to assert claims on behalf of bus passengers. ................. 6

   II.    Wynne properly asserted claims under the United States and Illinois
Constitutions. ............................................................................................................... 9

     A.    Wynne rightly alleged violation of the Supremacy Clause........................... 9

     B.    Wynne properly alleged violation of the Commerce Clause. ...................... 11

     C.    Wynne properly alleged violation of the Equal Protection Clause............. 13

       1.    Wynne properly asserted an Equal Protection claim because the
Ordinance is intentionally discriminatory based on national origin, alienage,
and race of Wynne's passengers. ...................................................................... 13

       2.    Wynne properly asserted an Equal Protection claim because the
classification and the disparate treatment between regularly scheduled and
unscheduled intercity buses is arbitrary. ......................................................... 15

     D.    Wynne properly alleged violation of the Due Process Clause. ................... 17

     E.    Wynne properly alleged violation of the Special Legislation Clause of the
Illinois Constitution. ........................................................................................... 19

     F.    Wynne properly asserted a claim under 42 U.S.C. § 1983. ......................... 23

Conclusion ..................................................................................................................... 24

# Table of Authorities

**Cases**

*Alioto v. Marshal Field's & Co.*,
  77 F.3d 934 (7th Cir. 1996) ................................................................ 6, 23

*Allen v. Woodfield Chevrolet, Inc.*,
  208 Ill.2d 12 (2003) ........................................................................ 21, 23

*Aptheker v. Sec'y of State*,
  378 U.S. 500 (1964) ............................................................................ 9

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ........................................................ 10, 11

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................ 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................... 6, 9

*Barker v. Riverside Cnty. Off. of Educ.*,
  584 F.3d 821 (9th Cir. 2009) ................................................................ 6

*Barrows v. Jackson*,
  346 U.S. 249 (1953) ............................................................................ 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................... 6, 9

*Best v. Taylor Mach. Works*,
  179 Ill.2d 367 (1997) .......................................................................... 19

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ................................................................ 9

*Brooks v. Ross,*
    578 F.3d 574 (7th Cir. 2009) ................................................................ 6, 9

*Brown v. City of Oneonta, New York,*
    221 F.3d 329 (2d Cir. 2000) ................................................................ 13

*Caplin & Drysdale, Chartered v. United States,*
    491 U.S. 617 (1989) ............................................................................ 6, 7

*Centro Presente v. U.S. Dep't of Homeland Sec.,*
    332 F. Supp. 3d 393 (D. Mass. 2018) ................................................ 14

*Craig v. Boren,*
    429 U.S. 190 (1976) ............................................................................ 6, 7

*Crusius v. Illinois Gaming Bd.,*
    216 Ill.2d 315 (2005) .......................................................................... 19

*D.L. v. Unified Sch. Dist. No.*
    497 F.3d 768 (10th Cir. 2010) ............................................................ 17

*Deide v. Day*, __ F.Supp.3d __,
    2023 WL 3842694 (S.D.N.Y, June 6, 2023) ...................................... 18

*Edwards v. California,*
    314 U.S. 160 (1941) ............................................................................ 11, 12

*Ezekiel v. Michel,*
    66 F.3d 894 (7th Cir. 1995) ................................................................ 5

*GEO Group, Inc. v. Newsom,*
    50 F.4th 745 (9th Cir. 2022) .............................................................. 10

*Grafon Corp. v. Hausermann,*
    602 F.2d 781 (7th Cir. 1979) .............................................................. 5

*Grasse v. Dealer's Transp. Co.,*
    412 Ill. 179 (1952)) ............................................................................ 19

*Healy v. Beer Inst.,*
    491 U.S. 324 (1989) ............................................................................ 13

iv

*Hughes v. Oklahoma,*
   441 U.S. 322 (1979) ................................................................ 12

*Jeffery v. City of New York,*
   No. 20-CV-2843, 2022 WL 204233 (E.D.N.Y. Jan. 24, 2022) ................................ 17

*Johnson v. City of Cincinnati,*
   310 F.3d 484 (6th Cir. 2002) ....................................................... 17

*Kent v. Dulles,*
   357 U.S. 116 (1958) ................................................................. 8

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ........................................................... 6, 7, 8

*Lutz v. City of York, Pa.,*
   899 F.2d 255 (3d Cir. 1990) ........................................................ 17

*Lyons v. Equifax Info. Servs., LLC,*
   455 F. Supp. 3d 746 (N.D. Ill. 2020 ................................................ 6

*Mem'l Hosp. v. Maricopa Cnty.,*
   415 U.S. 250 (1974) ............................................................ 17, 18

*Mhany Mgmt., Inc. v. Cnty. of Nassau,*
   819 F.3d 581 (2d Cir. 2016) ....................................................... 14

*Moline Sch. Dist. No. 40 Bd. of Educ. v. Quinn,*
   2015 IL App (3d) 140535 .......................................................... 22

*Nunez by Nunez v. City of San Diego,*
   114 F.3d 935 (9th Cir. 1997) ...................................................... 17

*Park 'N Fly of Tex., Inc. v. City of Houston,*
   327 F. Supp. 910 (S.D. Tex. 1971) ................................................. 12

*Philadelphia v. New Jersey,*
   437 U.S. 617 (1978) ............................................................... 11

*Puente Ariz. v. Arpaio,*
   No. CV-14-01356-PHX-DGC, 2016 WL 6873294 (D. Ariz. Nov. 22, 2016) ............ 10

v

*Allen v. Woodfield Chevrolet, Inc.*,
  208 Ill.2d 12, 22 (2003) ................................................................................. 20

*Williams v. Town of Greenburgh*,
  535 F.3d 71 (2d Cir. 2008) ............................................................................. 17

*Starnes v. Capital Cities Media, Inc.*,
  39 F.3d 1394 (7th Cir. 1994) ......................................................................... 23

*State v. Martinez*,
  896 N.W.2d 737 (Iowa 2017) ......................................................................... 10

*Stauffer v. Innovative Heights Fairview Heights, LLC*,
  480 F.Supp.3d 888 (S.D. Ill. 2020) .............................................................. 19

*Taylor Mach. Works*,
  179 Ill.2d at 394 .............................................................................................. 21

*U.S. Dep't of Lab. v. Triplett*,
  494 U.S. 715 (1990) ........................................................................................... 7

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012)) .................................................................... 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ......................................................................................... 13

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................... 7

*Woods v. City of Greensboro*,
  855 F.3d 639 (4th Cir. 2017) ........................................................................... 6

**Statutes**

42 U.S.C. § 1983 ............................................................................................ 23, 24
IL Const., art IV, sec. 13 .................................................................................. 19

**Rules**

FED. R. CIV. P. 12(b) ........................................................................... 5, 6, 13, 23, 24

vi

**Other Authorities**

Richard Fallon, *As-Applied and Facial Challenges and Third-Party Standing*,
    113 HARV. L. REV. 1321 (2000)....................................................................... 7

**Introduction**

Wynne alleges that the Ordinance is unconstitutional, placing the City on notice as to the nature of its claims. Wynne specifically alleges that the Ordinance violates: (1) the Supremacy Clause because it regulates immigration, a subject reserved exclusively to the federal government; (2) the Interstate Commerce Clause because it imposes conditions hampering the exercise of interstate commerce; (3) the Equal Protection Clause because (a) it intentionally discriminates based on race and national origin and (b) arbitrarily discriminates among bus companies without a rational basis; (4) the Due Process Clause because it impermissibly burdens the fundamental right to travel without being narrowly tailored to meet the City's legitimate interest, and (5) the Special Legislation provision of the Illinois Constitution because it confers a special benefit on those bus companies exempted from the Ordinance's requirements. These facts put the City on notice of the nature of the claims asserted against it and plausibly allege that the Ordinance is unlawful. Nothing further is required to survive a motion to dismiss.

In response, the City makes three primary arguments, none of which warrant dismissal. First, the City claims that Wynne cannot raise the constitutional interests of its passengers, even though nearly all the case law confirms otherwise. Second, the City claims that its Ordinance is not directed towards migrants but is rather a traffic safety ordinance, asking the Court to ignore the context in which the Ordinance was passed, the language of the Ordinance that exempts many other buses from its onerous regulations, despite their obvious effects on traffic and safety, as well as the

practical effect of the Ordinance itself. Third, the City argues that the Ordinance is a valid exercise of its police power, improperly relying on facts outside the pleadings that are, in any event, unsupported by any evidence.

In short, Wynne alleged legitimate claims concerning a particularly important issue which should be resolved on their merits. The City's motion should be denied.

### Facts

On January 5, 2024, Wynne filed its Complaint alleging that the Municipal Code of Chicago, Section 9-48-050, titled "Buses – Stopping, standing and parking" (as amended in 2023) ("Ordinance") violates the Supremacy, Interstate Commerce, Equal Protection, and Due Process Clauses of the U.S. Constitution and the Special Legislation Clause of the Illinois Constitution.[1] The Complaint provides detailed factual allegations showing how the Ordinance was designed to prevent entry of migrants into Chicago. For example, the Complaint states:

- Facial discriminatory remarks from at least one City Council member.[2]

- Attempt by the City Council to change Chicago's "Sanctuary City" status in September 2023.[3]

- Attempt by allies of Mayor Brandon Johnson to limit the City's resources for migrant sheltering in November 2023.[4]

- Detailed discussion of prior versions of the Ordinance and how the language was changed in November and December 2023 to achieve the City's goal through a purported traffic regulation.[5]

---

[1] *See* ECF No. 1.
[2] *Id.* ¶ 13.
[3] *Id.* ¶ 14.
[4] *Id.* ¶ 15.
[5] *Id.* ¶¶ 17–27.

- How other cities join the Chicago campaign to stop the migrants and asylum seekers from entering their jurisdictions.[6]

While every major news outlet in the United States knows that the Ordinance was Chicago's response to Texas Governor Abbott's decision to transport migrants from Texas to Chicago, the City argues that the Ordinance had nothing to do with migrants. But this argument is baseless, as supported by the City's own followers. One of these followers is the City of New York Mayor Adams who issued an executive order for the same goal. The only difference is that Mayor Adams is more upfront about his intentions:

> **Mayor Adams:** First, what Governor Abbott has done in his total reckless disregard for using people as pawns, he has shifted, and he just wants to create chaos. We can't be so stagnant that we don't respond to his shift. And that is what we're going to do. We're going to be extremely calculative in how we do it, utilize our manpower and resources and utilize our executive order powers to not just be stagnant. We put out an executive order. If he's shifting, we're going to shift. That's what the corp counsel and City Hall counsel…Lisa has been amazing and thinking one step ahead.
>
> And we coordinated and communicated with the municipalities in the area. They all should do the same EO. They should look at everyone that has the train line that leads into the city. Everyone that has municipalities around us, they should do the same thing with EO. **This is what we learned from Chicago.** He tried it in Chicago also. We're dealing with a person who just wants to disrupt. It's not just about raising the attention on an issue. This is a mean-spirited way using people and disrupting municipalities, not only in this region and in other parts of the entire country.[7]
> …

---

[6] *Id.* ¶ 28.

[7] Transcript of Mayor Adams' Media Conference on Jan. 2, 2024, https://www.nyc.gov/office-of-the-mayor/news/002-24/transcript-mayor-adams-holds-in-person-media-availability (last visited on Feb. 15, 2024).

**Mayor Adams:** The executive order is not backfiring. ==We spoke with our colleagues in Chicago who told us that this is what Governor Abbott did in Chicago.== He started dropping people miles away and telling them that you are in Chicago proper. And so we are continually anticipating the move of his actions. And what I am really excited about is that we are not willing to be just stationary. If we have to change the EO. We'll change the EO. If we have to alter the EO, we have to alter the EO.[8]
…

And I keep saying this over and over again. On everything we do in this city, New York City is a place of rules. It's a place of law and order. Not unlawfulness and disorder. And this is no different. We're saying that if you come to our city, you're a bus operator, this is what you must comply with. If you try to go to other municipalities outside our region, ==we want them to join like they're doing in Chicago==.[9]
…

**Mayor Adams:** First, D.C., I think I'm going to D.C. on the 17th or 18th to meet with the mayors across the country because I want them to get more engaged in this. ==And we learned about the layers of doing this from Mayor Johnson in Chicago==. And he stated that they started after he put in his EO, they started dropping off outside.

Additionally, at least twenty-four other localities in the Chicago area enacted similar ordinances including Hinsdale, North Chicago,[10] Woodstock,[11] Waukegan, Highwood, Grayslake, Buffalo Grove,[12] Joliet, Wilmington,[13] Brookfield,[14] Niles,

---

[8] *Id.*

[9] *Id.*

[10] https://www.cnn.com/2024/01/03/us/migrant-crisis-chicago-buses-vote/index.html (last visited on Feb. 20, 2024).

[11] https://news.wttw.com/2024/01/04/several-chicago-suburbs-take-steps-prevent-more-unannounced-migrant-drop-offs-texas (last visited on Feb. 20, 2024).

[12] https://www.chicagotribune.com/2024/01/04/more-chicago-area-suburbs-pass-ordinances-to-curb-migrant-drop-offs/ (last visited on Feb. 20, 2024).

[13] https://www.cbsnews.com/chicago/news/city-council-woodstock-expected-to-vote-new-migrant-ordinance/ (last visited on Feb. 20, 2024).

[14] https://www.rblandmark.com/2024/01/09/brookfield-limits-migrant-drop-offs/ (last visited on Feb. 20, 2024).

Lincolnwood, Norridge,[15] Kankakee, McHenry,[16] Lake Barrington,[17] Crest Hill,[18] Glencoe,[19] Aurora,[20] Winnetka,[21] Highland Park, Deerfield,[22] Oak Lawn,[23] and Wilmette.[24]

## Standard of Review

For a Rule 12(b)(1) motion to dismiss based on lack of standing, the court should accept all well-pleaded factual allegations as true and draw all reasonable inferences for the plaintiff.[25] When a defendant challenges standing as a factual matter, the court is also allowed to look beyond the jurisdictional allegations of the complaint and consider any evidence submitted on the issue to determine whether in fact subject matter jurisdiction exists.[26]

When considering a defendant's motion to dismiss under Rule 12(b)(6), a court must construe the factual allegations in the complaint in the light most favorable to

---

[15] https://www.chicagotribune.com/2024/01/30/niles-lincolnwood-norridge-pass-ordinances-to-curb-unscheduled-bus-drop-offs-of-migrants/ (last visited on Feb. 20, 2024).

[16] https://chicago.suntimes.com/2024/1/3/24023840/wave-of-chicago-suburbs-move-to-block-migrant-arrivals (last visited on Feb. 20, 2024).

[17] https://www.chicagotribune.com/2024/01/22/lake-barrington-cites-public-health-safety-and-welfare-for-ordinance-banning-unplanned-migrant-bus-dropoffs-in-the-small-lake-county-town/ (last visited on Feb. 20, 2024).

[18] https://abc7chicago.com/chicago-migrant-crisis-crest-hill-migrants-suburbs-buses/14328169/ (last visited on Feb. 20, 2024).

[19] https://www.chicagotribune.com/2024/01/23/glencoe-village-board-mirrors-other-chicagoland-communities-with-new-busing-ordinance/ (last visited Feb. 20, 2024).

[20] https://www.chicagotribune.com/2024/01/04/aurora-officials-say-no-bus-drop-offs-of-migrants-in-city-since-new-regulations-approved/ (last visited on Feb. 20, 2024).

[21] https://www.chicagotribune.com/2024/01/10/winnetka-becomes-latest-suburb-to-pass-migrant-busing-ordinance/ (last visited on Feb. 20, 2024).

[22] https://www.chicagotribune.com/2024/01/17/highland-park-and-deerfield-regulate-bus-drop-offs-after-migrants-repeatedly-abandoned-on-side-of-the-road/ (last visited on Feb. 20, 2024).

[23] https://abc7chicago.com/migrants-in-chicago-illinois-news-how-to-help/14302638/ (last visited on Feb. 20, 2024).

[24] https://www.therecordnorthshore.org/2024/01/10/winnetka-joins-dozens-of-suburbs-in-regulating-migrant-bus-dropoffs/ (last visited on Feb. 20, 2024).

[25] *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

[26] *Id.*; *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979).

the plaintiff.[27] If the complaint provides fair notice of the claim and the factual allegations are enough to show that the right to relief is plausible, a court should deny the defendant's motion.[28] Likewise, the court "may not look to materials beyond the pleading itself."[29] At the dismissal stage, this Court must accept factual allegations as true and deny a motion to dismiss if the allegations allow for the reasonable inference that the defendant is liable for the alleged misconduct.[30]

## Argument & Authorities

### I. Wynne has standing to assert claims on behalf of bus passengers.

The City contends that Wynne cannot assert claims on behalf of Wynne's migrant passengers because Wynne has not alleged a sufficiently close relationship to its passengers or a hindrance to the passengers' ability to protect their own interests.[31] But the City's view is out of focus.

It is a well-established law that "[v]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."[32]

---

[27] *Barker v. Riverside Cnty. Off. of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

[28] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555–56; *Woods v. City of Greensboro*, 855 F.3d 639, 652–53 & n.9 (4th Cir. 2017); *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

[29] *Alioto v. Marshal Field's & Co.*, 77 F.3d 934, 936 (7th Cir. 1996) (citing FED. R. CIV. P. 12(b)).

[30] *Lyons v. Equifax Info. Servs., LLC*, 455 F. Supp. 3d 746, 748 (N.D. Ill. 2020) (citing *Twombly*, 550 U.S. at 557).

[31] ECF No. 18-1 at 5–6 (citing *Kowalski v. Tesmer*, 543 U.S. 125 (2004)).

[32] *Craig v. Boren*, 429 U.S. 190, 195 (1976) (holding that a vendor of alcoholic drinks had standing to bring an equal protection claim on behalf of her would-be customers against a law setting a different drinking age based on gender); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623–24 (1989) (holding that law firm had standing to challenge the constitutionality of a drug forfeiture statute on behalf of an existing client where forfeited assets were needed to pay attorney's fees); *Barrows v. Jackson*, 346 U.S. 249, 254–58 (1953) (holding that in an action to enforce a racially

According to Professor Fallon, the Supreme Court has almost invariably upheld third-party standing to assert plausibly meritorious claims.[33]

In *Triplett*, the Supreme Court of the United States allowed a disciplined lawyer to invoke the third-party standing of his clients to challenge the fee restriction that resulted in his punishment.[34] The Court held that *Triplett* falls within the class of cases where it has "allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."[35] Like *Caplin & Drysdale*, *Triplett* concerned the representation of known claimants.

Similarly, in *Craig*, the vendor of alcoholic beer had two options: (1) heed the Oklahoma discriminatory drinking age statute, thereby incurring a direct economic damage through constriction of the vendor's market; or (2) disobey the statute and face sanctions.[36] Likewise, Wynne has two choices: (1) heed the Ordinance and incur direct economic injury through limitation on the number of possible trips to Chicago; or (2) disobey the Ordinance and face legal actions and impoundment of its buses by the City. Here, as in *Craig*, Wynne has standing to bring claims for violating its passengers' constitutional rights under the Equal Protection and Due Process Clauses.

---

restrictive land covenant, that white sellers of property have third party standing to litigate the constitutional rights of potential black buyers).

[33] *See* Richard Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1361 n.202 (2000).

[34] *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720–21 (1990) (a lawyer who had allegedly collected unlawful fees under the Black Lung Benefits Act had standing to raise due process right to legal representation on behalf of the black lung benefit claimants).

[35] *Warth v. Seldin*, 422 U.S. 490, 510 (1975); *see also Kowalski*, 543 U.S. at 129.

[36] *Craig*, 429 U.S. at 194.

The City cites *Kowalski* only for the pertinent rule. However, *Kowalski* dealt with attorneys asserting standing on behalf of *future* clients. Because the *Kowalski* attorneys did not have a "close relationship with their alleged clients; indeed, they have no relationship at all[,]" the Court declined to extend third-party standing.[37] But the relationship between Wynne and its passengers is more than just "hypothetical"—Wynne provides the method by which its passengers vindicate their fundamental rights to travel between states.[38]

The City also ignores the clear effect on the rights of Wynne's migrant passengers should the Court permit the City's unconstitutional restrictions. The jurisprudence on a person's right to travel is extensive and includes the following apt quote:

> The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment…Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country…may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.[39]

Under Texas' transportation program, migrants are offered the *opportunity* to travel—an exertion of their due process rights—which they accept voluntarily.[40] But like the restriction in *Kent* (and others after it), this Ordinance is unconstitutional as it "too broadly and indiscriminately restricts the right to travel and thereby abridges

---

[37] *Kowalski*, 543 U.S. at 131 (internal quotations omitted).
[38] *See id*.
[39] *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) (cleaned up).
[40] *See* ECF No. 1 ¶ 12.

the liberty guaranteed by" the Constitution.[41] The Court should deny the City's factual challenge on subject-matter jurisdiction grounds.

## II. Wynne properly asserted claims under the United States and Illinois Constitutions.

### A. Wynne rightly alleged violation of the Supremacy Clause.

Wynne claims the City's Ordinance violates the Supremacy Clause.[42] The Complaint provides the City with fair notice of the claim.[43] In support of its claim, Wynne also alleges more than sufficient facts to show that the purported traffic Ordinance is in fact a regulation on immigration.[44] Those factual allegations show a plausible violation of the Supremacy Clause. That is, when the factual allegations are assumed to be true, they show a right to relief that is more than mere speculation.[45]

The City does not dispute that the entry, travel, and tracking of aliens are areas preempted by the federal law. Instead, the City leans on the fact that the Ordinance does not mention bus passengers' immigration status.[46] Yet the City ignores that a state or local regulation can violate the Supremacy Clause through *de facto* regulation of immigration.

In *Newsom*, the Ninth Circuit vacated the district court's denial of preliminary injunctive relief and held that the appellants were likely to prevail on their claim that the California statute violated the Supremacy Clause as applied to private operators

---

[41] *Aptheker v. Sec'y of State*, 378 U.S. 500, 505 (1964).
[42] ECF No. 1 ¶¶ 32-33.
[43] *See Brooks*, 578 F.3d at 581.
[44] *See Arizona v. United States,* 567 U.S. 387, 399 (2012) (discussing three primary principles of preemption under Supremacy Clause); *see also Brooks*, 578 F.3d at 581.
[45] *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); *see also Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555–56.
[46] *See* ECF No. 18-1 at 8.

of Immigration and Customs Enforcement ("ICE") detention facilities. According to the statute, "a person shall not operate a private detention facility within the state."[47] Although the statute was silent on immigration, the court noted that in California, ICE relied on privately owned and operated facilities. The court reasoned that a state statute cannot "regulate whether or where an immigration detainee may be confined."[48] Here, Wynne's allegations plausibly assert that the Ordinance regulates entry of migrants just as California regulated immigration. Both the Chicago Ordinance and California statute impermissibly created their own *de facto* immigration policies.

The City also disregards established precedent that facially neutral regulation can still violate the Supremacy Clause as applied to an alien. In *Arpaio*, the court held that the facially neutral Arizona forgery statute was field preempted as-applied to unauthorized alien's fraud committed in the I-9 process.[49]

Even if the Ordinance, on its face, amounts to an innocent traffic regulation traffic, as applied, the Ordinance targets migrant buses—a plausible violation of the Supremacy Clause. "[P]reemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal."[50] *Brewer* involved the question of conflict preemption of Arizona's policy refusing to allow

---

[47] *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022).

[48] *Id.* at 761.

[49] *Puente Ariz. v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at *6–12 (D. Ariz. Nov. 22, 2016); *See also State v. Martinez*, 896 N.W.2d 737, 755–56 (Iowa 2017) (holding that the Iowa identity theft statute was field preempted by federal immigration law as applied to an alien who used birth certificate of another to obtain employment).

[50] *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) (quoting *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012)).

DACA recipients to obtain drivers' licenses.[51] The court held that the plaintiff made a plausible preemption claim by showing that the policy interferes with the federal government decision to let DACA recipients work in the United States.[52] The court noted "[a]s a practical matter, the ability to drive may be a virtual necessity for people who want to work in Arizona.[53] The record show[ed] that more than eighty-seven percent of Arizona's workforce commutes to work by car."[54] The court reasoned that "[i]n considering whether a state law is conflict-preempted, [a court should] consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written."[55]

In this case, the City takes away transportation from those coming from outside the Chicagoland area, the only realistic option available to migrants, and conveniently argues that migrants were not even the subject of the Ordinance. Wynne plausibly alleged that the Ordinance violates the Supremacy Clause.

### B.    Wynne properly alleged violation of the Commerce Clause.

"[I]t is settled beyond question that the transportation of persons is 'commerce', within the meaning of [the Interstate Commerce Clause of the U.S. Constitution]."[56] State laws that discriminate against interstate commerce, whether facially or in effect, are invalid.[57] The court should apply the "strictest scrutiny" to analyzing a

---

[51] *Brewer*, 757 F.3d at 1058–59.
[52] *Id.* at 1062–63.
[53] *Id.* at 1062.
[54] *Id.*
[55] *Id.* at 1062–1063 (cleaned up).
[56] *Edwards v. California*, 314 U.S. 160, 166 (1941).
[57] *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

discriminatory law.[58] State statutes cannot impose conditions hampering a right to pursue interstate commerce operations.[59]

In *Edwards*, an individual was convicted for violating a California statute, making it a misdemeanor to bring into California a non-resident indigent person.[60] Reversing the conviction, the Supreme Court held that the statute imposed an unconstitutional burden on interstate commerce.[61] The Supreme Court acknowledged California's assertion that the influx of migrants into California had resulted in various challenges. But the Court held that the U.S. Constitution prohibits "attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders."[62] The Court concluded that the statute "must fail under any known test of the validity of State interference with interstate commerce."[63]

Here, the City's Ordinance significantly interferes with Wynne's ability to transport migrants from Texas to Chicago, and any violation of the Ordinance results in a civil action and impoundment of Wynne's buses. Thus, the Ordinance fails under any known test for analysis of the Interstate Commerce Clause.[64] Even if we assume that the Ordinance had nothing to do with migrants, the burden created by the Ordinance still violates the Interstate Commerce Clause.

---

[58] *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).
[59] *Park 'N Fly of Tex., Inc. v. City of Houston*, 327 F. Supp. 910 (S.D. Tex. 1971).
[60] *See Edwards*, 314 U.S. at 160.
[61] *Id.* at 177.
[62] *Id.* at 167.
[63] *Id.*
[64] *Id.*

Additionally, "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."[65] As discussed above, many jurisdictions are following the Chicago model for preventing transportation of migrants. This trend amplifies the cost of Wynne's business operation and may eventually result in complete ban of interstate transportation for the migrants.

Because the Ordinance imposes conditions hampering interstate commerce, Wynne made a plausible claim for violating the Interstate Commerce Clause, and the Court should deny City's Rule 12(b)(6) Motion to Dismiss.

### C. Wynne properly alleged violation of the Equal Protection Clause.

1. Wynne properly asserted an Equal Protection claim because the Ordinance is intentionally discriminatory based on national origin, alienage, and race of Wynne's passengers.

The Ordinance is intentionally discriminatory based on national origin, alienage, and race and fails the "strict scrutiny" test. Although it may be facially neutral, it has an adverse effect motivated by discriminatory animus and was applied in an intentionally discriminatory manner.[66] Intentional discrimination can be shown where "a discriminatory purpose [was] a motivating factor" in the City's action.[67] Discriminatory purpose can be established through "sensitive inquiry into such

---

[65] *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

[66] *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000).

[67] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

circumstantial and direct evidence of intent as may be available."[68] "[T]he combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy [is] sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision."[69] "[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications."[70]

As alleged in the Complaint, the intentional discrimination is obvious from: (1) Alderman Ray Lopez's facially discriminatory remarks; (2) the City's attempt to change its "Sanctuary City" status prior to amending the Ordinance; (3) the City's attempt to limit the resources for migrant sheltering prior to amending the Ordinance; (4) twice amending the Ordinance in less than 30 days to target specifically the companies providing transportation to the migrants; and (5) the records of other cities which followed the Chicago model in preventing entry of migrants.[71] These allegations are more than enough to put City on notice and to make a violation of Equal Protection Clause plausible.

---

[68] *Id.* at 266.
[69] *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018).
[70] *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608–609 (2d Cir. 2016) (internal citation omitted).
[71] *See* ECF No. 1 ¶¶ 10–28.

2. Wynne properly asserted an Equal Protection claim because the classification and the disparate treatment between regularly scheduled and unscheduled intercity buses is arbitrary.

The Ordinance treats similarly situated persons (bus companies and their passengers) differently. The rules implementing the Ordinance classified the intercity buses into two categories of regularly scheduled and unscheduled intercity buses. The rules then placed stringent limits on the unscheduled intercity buses. Notwithstanding City's alleged differences between these two categories, a simple review of the history of the Ordinance, as discussed in the Complaint, indicates that the classification was arbitrary and only to target the migrant buses. Before the 2023 Legislative Session, an intercity bus needed to obtain a permit only if it used a designated loading/unloading area for "regular loading or unloading of passengers, luggage or other goods."[72] Thus, no approval was needed for irregular or occasional use of a designated area.[73] Additionally, the Ordinance's restrictions did not apply to charter buses.[74] Thus, Wynne was not covered by the Ordinance simply because Wynne is considered a charter bus and unloading of migrants was on irregular basis.

On or about November 16, 2023, the City amended the Ordinance by: (a) addition of the phrase "or other location" which broadened the scope of the Ordinance to cover locations that are not considered designated loading or unloading areas; and (b) removing the broad charter bus exception and creating an exception for "sightseeing tour" buses instead.[75] These changes were designed to target Wynne

---

[72] *Id.* ¶ 17.
[73] *Id.* ¶ 18.
[74] *Id.* ¶ 19.
[75] *Id.* ¶ 21.

because the purpose of unloading migrants in Chicago was not "sightseeing." The only potential issue, which was missed by the City, was that the November version of the Ordinance still applied only to those buses engaging in "regular loading or unloading of passengers."[76] Wynne was thus still outside the scope of the Ordinance. After initiating several legal actions against various Wynne's subcontractors, the City noticed the issue and amended the Ordinance once again. Under the December amendment, the word "regular" was finally removed from the Ordinance.[77]

Now the City wants us to believe that the distinction between the regularly scheduled and unscheduled intercity buses is only because of the amount of information available to the public before a trip. This argument fails based on the face of the Ordinance which makes a charter "sightseeing tour" bus exempt from the Ordinance. This essentially means that Wynne can easily bring migrants to Chicago for unscheduled sightseeing tours (which would worsen traffic), but it cannot simply transport them from Texas to Chicago. Therefore, Wynne alleged sufficient facts, showing that at least for this case a regularly scheduled intercity bus is similarly situated to unscheduled intercity buses.

Additionally, the disparate treatment of these two categories of buses is completely arbitrary and unreasonable. For instance, regularly scheduled intercity curbside buses can drop off passengers on city streets *anytime* and for an *unlimited number* of trips, without raising any alleged traffic or safety concerns.[78] Unscheduled

---

[76] *Id.* ¶ 20.
[77] *Id.* ¶ 25.
[78] *Id.* ¶ 53.

sightseeing buses enjoy the same freedoms. But a non-sightseeing, unscheduled intercity bus (read: buses transporting migrants) can only have two drop offs in Chicago per day, Monday to Friday between 8:00 a.m. and 5:30 p.m., and must arrive within 30 minutes before or after the approved arrival time, and must obtain pre-approval before dropping off any passengers, anywhere, through an approval process that can take a month or more.[79] The Ordinance can pass the rational basis test only if prevention of entry of migrants were a legitimate interest, which is not.

Therefore, Wynne made a plausible claim that the Ordinance on its face and/or as applied treats similarly situated persons differently without a reasonable basis, in violation of the Equal Protection Clause.

### D. Wynne properly alleged violation of the Due Process Clause.

"The right of interstate travel has repeatedly been recognized as a basic constitutional freedom."[80] The Ordinance violates both Wynne's and their passengers' fundamental right of free movement/interstate travel and fails the strict scrutiny test.[81]

---

[79] *Id.* ¶¶ 47, 53 and n.7.

[80] *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 254 (1974).

[81] *See Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008); *Jeffery v. City of New York*, No. 20-CV-2843, 2022 WL 204233, at *5 (E.D.N.Y. Jan. 24, 2022) ("Freedom of movement…is a well-established fundamental right"); *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (holding that "the Constitution protects a right to travel locally through public spaces and roadways."); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) ("Citizens have a fundamental right of free movement") (internal citation omitted); *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990) ("[T]he right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history'"); *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 776 (10th Cir. 2010) (acknowledging that the fundamental right of free movement protects the interstate travel).

The fundamental right to interstate travel is a substantive due process right. As discussed above, Wynne has standing to assert constitutional claims on behalf of its passengers. As for Wynne's own due process claim, City cites several cases and alleges that a company cannot enjoy the fundamental right to interstate travel. But none of those cases specifically addressed whether a company has a substantive due process right to interstate travel. Acknowledging a constitutional right for individuals does not negate existence of such right for companies unless such question is specifically asked from the court.[82]

Additionally, "[t]o trigger strict scrutiny, there need not be a complete bar to travel, as the right to intrastate travel includes freedom from curtailment of said travel."[83] "[T]o the extent the purpose of [a statutory] requirement is to inhibit the immigration of indigents generally, that goal is constitutionally impermissible."[84]

The Ordinance violates the fundamental rights of interstate travel of Wynne and their passengers. As apparent from the face of the statute, the goal is prohibition of migration into the City of Chicago. The Ordinance also makes it extremely difficult, if not impossible, for Wynne to transport people across state lines from Texas to Chicago. At a minimum, Wynne alleged facts showing that the City's Ordinance is not narrowly tailored to serve the City's stated interests of traffic and safety regulation, thereby failing any level of scrutiny.

---

[82] *See* ECF No. 18-1 at 21.
[83] *Deide v. Day*, __ F.Supp.3d __, 2023 WL 3842694, *21 (S.D.N.Y, June 6, 2023).
[84] *Mem'l Hosp.*, 415 U.S. at 264.

**E.     Wynne properly alleged violation of the Special Legislation Clause of the Illinois Constitution.**

The Court should deny the City's motion as to Wynne's claim under the Illinois Constitution's Special Legislation Clause because the Complaint plausibly alleges that the Ordinance enacts an arbitrary classification to benefit regularly scheduled buses. Under the Special Legislation Clause, the legislature is prohibited from conferring "a special benefit or privilege upon one person or group and excluding others that are similarly situated."[85]

To determine whether a law constitutes impermissible special legislation, the Court should apply a two-part test evaluating: (1) whether the statutory classification discriminates in favor of a select group and against a similarly situated group; and (2) if so, whether the classification is arbitrary.[86] Illinois courts generally evaluate a special legislation challenge under the same standard as an equal protection challenge and must consider "whether the basis for the classifications is sufficiently related to the evil to be obviated by the statute" as well as "the natural and reasonable effect of the legislation on the rights affected by the provision."[87]

The City highlights its unsupported contention that unscheduled intercity buses are not "similarly situated" to regularly scheduled buses because, among other things, they "operate differently" and "have different business models."[88] For these

---

[85] *Crusius v. Illinois Gaming Bd.*, 216 Ill.2d 315, 325 (2005); IL Const., art IV, sec. 13 ("The General Assembly shall pass no special or local law when a general law is or can be made applicable.").

[86] *Id.*; *Stauffer v. Innovative Heights Fairview Heights, LLC*, 480 F.Supp.3d 888, 902 (S.D. Ill. 2020).

[87] *Best v. Taylor Mach. Works*, 179 Ill.2d 367, 394 (1997) (citing *Grasse v. Dealer's Transp. Co.*, 412 Ill. 179 (1952)).

[88] *See* ECF No. 18 at 24.

reasons, the City asserts, the Ordinance's discriminatory classification between the two groups is justified because the unscheduled buses "pose unique risks to public safety and the orderly management of traffic," meriting "the City's regulations specific to" those buses.[89]

These arguments are unpersuasive for several reasons. First, they rely on information extraneous to the pleadings and therefore cannot be the basis for dismissal. Second, the City does not attempt to explain why the groups of buses—all of which transport similar numbers of passengers, in similar vehicles, to similar locations in the City of Chicago—are situated differently sufficient to justify the Ordinance's stringent restrictions on unscheduled intercity buses. Third, the City cannot demonstrate that the classification is supported by a "sound and reasonable basis," as the Special Legislation Clause requires.[90] Accepting as true the factual allegations in Wynne's Complaint, as this Court must do, the Ordinance imposes extremely demanding requirements on so-defined "unscheduled intercity buses" like Wynne's: these bus companies must submit an application for a specific permit *for each trip*, for which the City may easily withhold or delay approval—unlike the scheduled buses or buses that operate within the statistical area—in order to load or unload any "passengers, luggage or other goods" at "any" location in the City.[91]

These limits are coupled with harsh enforcement provisions allowing for steep fines and impoundment of vehicles.[92] Nowhere does the City explain why these

---

[89] *Id*. at 24–25.
[90] *See Allen v. Woodfield Chevrolet, Inc.*, 208 Ill.2d 12, 22 (2003).
[91] *See* ECF No. 1, ¶ 25.
[92] *Id.*

dramatic restrictions—which essentially prohibit this one group of buses from operating in Chicago entirely—are rationally related to the City's ambiguous need for "safety" and "orderly management of traffic."[93] In contrast, the other groups of buses—those that are regularly scheduled or operate within the statistical area—are not subject to such stringent permitting requirements or risk of punishment. To this end, the buses with regularly scheduled service or those that operate within the statistical area enjoy a "special benefit or privilege" that the City does not connect to any meaningful difference between the groups nor to "the evil to be obviated by the statute."[94] On the contrary, the Ordinance is targeted and restricts *only* unscheduled intercity buses operating outside the statistical area even though all buses pose similar burdens on safety and orderly traffic management. It defies logic to suggest that a bus's locus of origination outside the statistical area affects the orderly management of traffic within the City. A bus is a bus, regardless of whether it is traveling from Texas (outside the statistical area) or Joliet, Illinois (within the statistical area).

Illinois courts regularly strike down legislative provisions that make arbitrary classifications in violation of the Special Legislation Clause. In *Allen*, the Supreme Court of Illinois ruled that a legislative amendment creating a more burdensome process for consumers to pursue fraud claims against vehicle dealers—but not against other consumer fraud defendants—violated the Special Legislation Clause.[95] The

---

[93] *See* ECF No. 18-1 at 24–25.
[94] *See Taylor Mach. Works*, 179 Ill.2d at 394.
[95] *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill.2d 12, 33 (2003).

court rejected the defendant's argument that the provision was "simply part of the legislature's ongoing regulation of automobile sales," because the demanding restrictions had no reasonable relation to a need by the legislature to regulate vehicle dealers specifically, and instead had an "artificially narrow focus."[96] In *Quinn*, the court struck down a property tax exemption on land leased to certain businesses by the county airport authority but not others, concluding that the law was not reasonably "tailored to address the conditions presented by that unique situation" and instead singled out businesses that were, in all meaningful ways, similarly situated to others that did not receive the exemption.[97]

Like the "artificially narrow" regulations enacted by the legislatures in those cases, the Ordinance here confers a "special privilege" upon scheduled buses and those operating within the statistical area by permitting them to conduct their business operations throughout Chicago without undergoing a burdensome permitting process that is subject to the City's approval.

Because Wynne stated a plausible claim under the Special Legislation Clause of the Illinois Constitution, the City offers an unsupported justification for the classification. The City contends that it has "rational reasons for treating unscheduled intercity buses differently" and those unscheduled intercity buses "pose unique risks to public safety and the orderly management of traffic."[98] Even if true, the Court may not look beyond the pleadings in deciding whether a claim should be

---

[96] *Id.* at 24, 33.
[97] *Moline Sch. Dist. No. 40 Bd. of Educ. v. Quinn*, 2015 IL App (3d) 140535, ¶¶ 27–28.
[98] *See* ECF No. 18-1 at 24.

dismissed under Rule 12(b).[99] But the City's attempt to incorporate materials beyond the pleadings only prove that dismissal before reaching the merits would be premature.

Because Wynne has pleaded facts that allow the Court to reasonably infer that the Ordinance makes a discriminatory classification that is not supported by a "sound and reasonable basis," this Court should deny the City's Motion to Dismiss as to Count V.[100]

### F.    Wynne properly asserted a claim under 42 U.S.C. § 1983.

The City contends that Wynne's claim under 42 U.S.C. § 1983 is doomed because Wynne does not allege a separate substantive claim.[101] But a quick glance reveals that the City's contention assumes the Court has already agreed with it as to each of Wynne's prior constitutional claims.[102]

To state a valid § 1983 claim, Wynne must allege that (1) a person acting under color of state law engaged in conduct that (2) deprived a person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.[103] Here, Wynne alleged that the City deprived its constitutional rights "under color of an ordinance[.]"[104] Wynne also alleged that the City acted under the color of state law when it amended a traffic ordinance to specifically target Wynne and other charter bus companies by (a) broadening the scope of the Ordinance to cover locations

---

[99] *Alioto*, 77 F.3d at 936 (citing FED. R. CIV. P. 12(b)).
[100] *See Allen*, 208 Ill.2d at 22.
[101] *See id.* at 25.
[102] *Id.*
[103] 42 U.S.C. § 1983; *Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994).
[104] *See* ECF No. 1 ¶¶ 5, 74–75 (incorporating Wynne's claims for constitutional violations under Equal Protection and Due Process doctrines by reference).

beyond loading/unloading zones, (b) authorizing the commissioner to require any conditions or restrictions to receive a permit at his sole discretion, (c) adding a fine to compel compliance with the Ordinance, and (d) removing the charter bus exception.[105]

As discussed above, Wynne plausibly asserted claims for violating the United States Constitution, and therefore, its claim under 42 U.S.C. § 1983 should not be dismissed.

## Conclusion

Plaintiff Wynne Transportation LLC respectfully requests that the Court deny Defendant City of Chicago's Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and grant Wynne such other relief as it deems just and proper. Alternatively, if the Court finds a pleading deficiency in Wynne's Complaint, Wynne respectfully requests an opportunity to cure the deficiency.

Respectfully submitted,

*/s/ Michael Kozlowski*

Christopher J. Esbrook (ARDC No. 6282829)
Michael Kozlowski (ARDC No. 6320950)
Marie Plecha (ARDC No. 6339526)
Esbrook P.C.
321 N. Clark Street, Suite 1930
Chicago, Illinois 60654
T: (312) 319-7680
christopher.esbrook@esbrook.com
michael.kozlowski@esbrook.com
marie.plecha@esbrook.com

---

[105] *Id.* ¶¶ 20–21.

24

ANDREWS MYERS, P.C.

Mark J. Levine*
Texas Bar No. 00791102
Elliot J. Kudisch*
Texas Bar No. 24122955
Hamed Moradi*
Texas Bar No. 24121020

1885 Saint James Place, 15th Floor
Houston, Texas 77056-4110
T: (713) 850-4200
F: (713) 850-4211
mlevine@andrewsmyers.com
ekudisch@andrewsmyers.com
hmoradi@andrewsmyers.com
*Admitted pro hac vice

**ATTORNEYS FOR PLAINTIFF**
**WYNNE TRANSPORTATION, LLC**

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, certify that on February 29, 2024, I submitted the foregoing document through the Court's CM/ECF system for service on all counsel of record.


       /s/ Michael Kozlowski

Michael Kozlowski
Esbrook P.C.

27